# EXHIBIT A

Electronically Filed
3/3/2023 10:59 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Erik F. Stidham (ISB #5483)
Jennifer M. Jensen (ISB #9275)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-5974
Telephone:  208.342.5000
Facsimile:  208.343.8869
E-mail:   efstidham@hollandhart.com
          jmjensen@hollandhart.com

*Counsel for Plaintiffs*

**IN THE DISTRICT COURT OF THE FOURTH  JUDICIAL DISTRICT OF THE**

**STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA**

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD; CHRIS ROTH, an individual; NATASHA D. ERICKSON, MD, an individual; and TRACY W. JUNGMAN, NP, an individual,<br><br>        Plaintiffs,<br><br>vs.<br><br>AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association,<br><br>        Defendants. | Case No. CV01-22-06789<br><br>**FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**(REDACTED)** |

St. Luke's Health System, Ltd. ("SLHS"), St. Luke's Regional Medical Center, Ltd.

("SLRMC"), Chris Roth ("Mr. Roth"), Dr. Natasha D. Erickson  ("Dr. Erickson"), and Tracy W.

Jungman, NP ("NP Jungman"), collectively "St. Luke's Parties" or "Plaintiffs," by and through

their counsel, Holland & Hart, LLP, hereby bring this Complaint against Ammon Bundy

("Bundy"), Ammon Bundy for Governor ("Bundy Campaign"), Diego Rodriguez ("Rodriguez"),

Freedom Man Press LLC ("FMP"), Freedom Man PAC ("FM PAC"), and the People's Rights

Network ("PRN"), collectively "Defendants," and allege as follows:

## NATURE OF THE CASE

1.      Defendants engaged in a grift, recklessly exploiting ███████████

of an Infant to gain money and publicity for themselves. Seeking to benefit financially, to

enhance their standing among their followers, and to grow the membership of and revenues from

PRN, Bundy (a former candidate for Governor and founder and leader of the activist People's

Rights Network) and Rodriguez (an aspiring political and religious figure, acolyte of Bundy,  and

consultant and spokesperson for the Bundy Campaign) acted in concert with the other

Defendants to launch a knowingly dishonest and  smear campaign that claimed Idaho State

employees, the judiciary, the police, primary care providers, and the St. Luke's Parties engaged

in widespread kidnapping, trafficking, sexual abuse, and killing of Idaho children.

2.      In furtherance of their smear campaign, Defendants used slick marketing tactics

and disinformation to launch a coordinated attack of defamation and organized business

disruption against the St. Luke's Parties. Defendants incited and agitated their followers with

false conspiracy theories of the kidnapping, trafficking, sexual abuse, and killing of children

purposefully creating the risk that their followers would threaten or actually commit acts of

violence against the St. Luke's Parties.  Defendants made no effort to conceal their improper

objectives.  Indeed, they publicly declared that they wanted to subject the St. Luke's Parties to

unrelenting public shaming that would cause reputational damage and humiliation of such

intensity that SLHS and SLRMC would be run out of business and Mr. Roth, CEO of SLHS, Dr.

Erickson, a St. Luke's pediatric physician, and NP Jungman, a St. Luke's nurse practitioner,

would lose their careers and be shunned by their friends, colleagues, neighbors, spouses, and children.

3.      As a premise for their wrongful actions, Defendants mischaracterized the Idaho Department of Health and Welfare's ("DHW") decision to intervene to ensure the health and safety of ███████████████████ Bundy, Rodriguez, and the other Defendants falsely claimed that DHW's intervention was wholly without basis and was an example of the widespread government conspiracy of kidnapping, trafficking, sexual abuse, and killing of children for financial gain.

4.      Defendants falsely stated that the St. Luke's Parties were participants in this nefarious organized ring and had participated in the kidnapping and mistreatment of the Infant. Among other things, Defendants falsely stated that (1) the St. Luke's Parties initiated and caused the State's intervention relating to the Infant, (2) the Infant had no need for medical care from the St. Luke's Parties, (3) the St. Luke's Parties provided unnecessary and improper medical treatment to drive up medical bills for the Infant's parents, (4) the St. Luke's Parties harmed the Infant, (5) the St. Luke's Parties had the authority to release the Infant but were illegally refusing to do so, and (6) that St. Luke's was conspiring with Idaho Governor Brad Little (Bundy's political opponent) in targeting the Infant.  The Defendants made these false statements and others relating to the St. Luke's Parties while knowing the statements to be without factual basis or recklessly disregarding the truth.

5.      Bundy and Rodriguez coordinated the wrongful attacks to further a number of improper objectives, including (1) to harm the St. Luke's Parties, (2) to subvert the authority and rulings of the judiciary through harassment, (3) to mislead and manipulate their followers, (4) to enhance their political reputations and personal brands, (5) to grow membership in the PRN,

(6) to drive traffic to Defendants' websites, (7) to benefit themselves financially through financial contributions, donations, and fees paid to the Bundy Campaign, Rodriguez's political action committee (FM PAC), the PRN, a supposed charity benefitting Rodriguez's family, Bundy's entities Dono Custos, Inc. and Abish-husbondi, Inc., and Rodriguez's entity Freedom Tabernacle Incorporated and Power Marketing Agency, LLC and Power Marketing Consultants LLC .

6.       The St. Luke's Parties bring this lawsuit to protect patients and staff from further harm, defamation, harassment, and threats of violence and to ensure that political bullying and Defendants' grift do not prevent St. Luke's from furthering its mission to improve the health of people in the communities it serves.

## PARTIES, VENUE, AND JURISDICTION

7.       At all times relevant hereto, Plaintiff SLHS was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho.

8.       At all times relevant hereto, Plaintiff SLRMC was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho.

9.       At all times relevant hereto, Plaintiff Mr. Roth was and is President and CEO of SLHS and a resident of Idaho.

10.       At all times relevant hereto, Plaintiff Dr. Erickson was and is a physician specializing in pediatric medicine.  She is an employee of SLRMC and a resident of Idaho.

11.       At all times relevant hereto, Plaintiff NP Jungman was and is a nurse practitioner specializing in pediatrics.  She is an employee of SLRMC and a resident of Idaho.

12.       At all times relevant hereto, Defendant Ammon Bundy was and is a resident of Idaho.  Bundy controls the Bundy Campaign and is the founder and leader of the PRN.  Through his control of the PRN, Bundy effectively controls PRN's website, peoplesrights.org. Bundy

generates money for his use and benefit by marketing himself as an anti-government, quasi-religious leader.

13.      Bundy owns and controls or owned and controlled at least two corporate entities (Dono Custos, Inc. and Abish-husbondi. Inc.) through which he generates revenues for himself from his campaign and leadership of PRN. Dono Custos receives money directly from members of PRN. Revenues received by Dono Custos are used to benefit Bundy. Abish-husbondi received payments directly from the Bundy Campaign and those payments benefited Bundy personally. The potential revenue to Bundy is significant. If each member of PRN annually contributes just $50 to Bundy through Dono Custos, Bundy could pocket more than $3,000,0000 per year. Bundy directed tens of thousands of dollars contributed to the Bundy Campaign to Abish-husbondi.

14.      On information and belief, the corporate personalities of Dono Custos and Abish-husbondi and Bundy are indistinguishable; Bundy exerts complete control over the entities and all decision making by the entities such that the entities operate as alter-egos of Bundy. On information and belief, Abish-husbondi and Dono Custos do not operate separately from Bundy, do not follow corporate formalities, and do not keep separate books.

15.      At all times relevant hereto, Defendant Bundy Campaign was and is an Idaho political organization formed for the ostensible purpose of raising money to support Bundy's effort to become Governor of Idaho.  Aaron Welling was the treasurer for the Bundy Campaign. Welling resigned in late spring 2022. After Welling's resignation, Bundy took over and became treasurer. Monies received by the Bundy Campaign were distributed to entities owned by Bundy and entities owned by Rodriguez.

16.      At all times relevant hereto, Defendant Rodriguez was a resident of Idaho. Rodriguez promotes himself as a world-renowned marketing consultant, motivational speaker,

religious leader, author, and political activist.  Rodriguez is a leader in the PRN, serves or served

as a consultant to and spokesperson for the Bundy Campaign, controls the FMP and the FM

PAC, and writes political attack columns for FMP under the alias "Gunner Steele." Rodriguez is

financially entangled with the other Defendants and seeks to benefit from the false conspiracy he

manufactured.  Rodriguez is the founder of Freedom Tabernacle Incorporated which purports to

be a church but is used as an entity to receive contributions, dues, or payments from members of

PRN. Also, Rodriguez is financially motivated to grow Freedom Tabernacle as he mandates

members "tithe" 10% of their earnings. Rodriguez benefits from monies received by the

Freedom Tabernacle and the growth of PRN. Rodriguez receives money from the Bundy

Campaign through at least one of his business entities, Power Marketing. Rodriguez use his

enhanced profile and the manufactured conspiracy relating to the Infant to sell three-day

"training" courses through Power Marketing for which he charges $15,000 per "student."

17.     On information and belief, the corporate personalities of Freedom Tabernacle

Incorporated, Power Marketing Agency, LLC, and Power Marketing Consultants, LLC are

indistinguishable from Rodriguez; Rodriguez exerts complete control over the entities and all

decision making by the entities such that the entities operate as alter-egos of Rodriguez. On

information and belief, Freedom Tabernacle, Power Marketing Agency, and Power Marketing

Consultants do not operate separately from Rodriguez, do not follow corporate formalities, and

do not keep separate books. To the extent the corporate entities have other individuals involved,

they are the family members controlled by Rodriguez. Freedom Tabernacle, Power Marketing

Agency, and Power Marketing Consultants are alter-egos of Rodriguez.

18.     At all times relevant hereto, and based on information on freedomman.org,

Defendant FMP held itself out as a limited liability company which owns and controls

freedomman.org, a website that specializes in political attacks and disinformation and advocates for the harassment of political opponents through "doxing."  FMP is not registered as an LLC in Idaho or registered to do business in Idaho.  FMP, its website, and all content on the FMP website are controlled by Rodriguez.

19.    At all times relevant hereto, FM PAC is and was an Idaho registered political action committee formed by and controlled by Rodriguez.  FM PAC works in coordination with FMP and is promoted on freedomman.org.

20.    Founded and controlled by Bundy, Defendant PRN is an unincorporated association of over 60,000 members. Like Bundy, PRN does not recognize the government's authority over a person's "life, liberty, or justly acquired property"; rather, PRN operates based on Bundy's teachings that PRN members are divinely ordained to adjudicate supposed violations of "rights" and punish extrajudicially the "wicked" person, through harassment, doxing, or the use of force. PRN owns and operates the peoplesrights.org website.  PRN markets itself as a network designed to defeat "government criminals" who seek to take away rights and freedoms. In truth, PRN is an unincorporated association controlled by Bundy which acts extra-judicially and uses doxing, harassment, economic disruption, and threats of violence to harass political enemies and to enhance Bundy's personal power.  At all times relevant hereto, PRN is controlled through Bundy's operations in Emmett, Idaho. Rodriguez is actively involved in PRN. Defendants actively market and promote PRN with the objective of increasing the payments that members of PRN make to the entities Bundy and Rodriguez control, including Dono Custos and Freedom Tabernacle.

21.    This Court has subject matter jurisdiction pursuant to Idaho Code § 1-705 and personal jurisdiction over the Defendants pursuant to Idaho Code § 5-514.

22.     Venue is proper in this District pursuant to Idaho Code §§ 5-401 and 5-404.

## GENERAL ALLEGATIONS

**Role of the Idaho Department of Health and Welfare in Child Welfare**

23.     Idaho's laws regarding child safety are primarily administered and implemented by DHW.

24.     Idaho law imposes mandatory reporting requirements on Idaho residents to report concerns about a child's safety.

25.     When a report is filed regarding child safety, DHW assesses the severity of the case.  In high-danger cases, a social worker and possibly police visit the family to check on the child.  Based on the visit and in consultation with the social or healthcare workers, police decide whether to declare the child in imminent danger. If the child is in imminent danger, police may place the child in temporary custody with DHW until a hearing can be held.

**The Role of St. Luke's in Child Health**

26.     SLHS is the only Idaho-based not-for-profit health care system.  SLRMC, a wholly owned subsidiary of SLHS, operates hospitals in Boise ("St. Luke's Boise") and Meridian ("St. Luke's Meridian").  SLHS and SLRMC share the same mission: to improve the health of people in the communities they serve.

27.     The St. Luke's Parties are subject to State and Federal law.  If a child is determined to be in imminent danger because of health issues and is transported to a St. Luke's hospital, the St. Luke's Parties will care for the child.  However, SLHS and SLRMC are not agents of DHW or any other State of Idaho department.  Mr. Roth is an employee of SLHS, and Dr. Erickson and NP Jungman are employees of SLRMC.  They take no direction from DHW or any other State department.

**St. Luke's Care for the Infant**

28.     On March 1, 2022, the parents took the Infant to the St. Luke's Boise

emergency room (ER) because the Infant had reportedly ███████████████ and had lost a

███████████████████.

29.     A St. Luke's ER provider treated the Infant for ███████████ Then, in

consultation with the on-call pediatric specialist, Plaintiff Dr. Natasha Erickson, the ER provider

admitted the Infant.  The parents agreed to admission.

30.     Upon admission, St. Luke's began to treat the Infant ██████████████████

██████████████████████. On March 2, 2022, a St. Luke's dietician diagnosed

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Due to this ██████████████████████, the dietician and Dr. Erickson agreed on a plan

to feed the Infant ████████████.

31.     The Infant continued to struggle with oral feeding.  Nevertheless, the parents

repeatedly sought to take the Infant home early despite the risk to the Infant.

32.     On March 3, 2022, Dr. Erickson met with the Infant's parents, and explained

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████. The parents agreed to let the Infant stay at St. Luke's for

another day.

33.     On March 4, 2022, the Infant's ██████████████████████. Although

Dr. Erickson recommended ████████████████████████████████████████

Infant home.  Dr. Erickson agreed to discharge the Infant at the parent's request with ████████

███████████████████████████████ Dr. Erickson explained

that the Infant ████████████████████████████████████████████████████
████████████████████████████████████

34.     The parents were with the Infant throughout the Infant's hospitalization.  They consented to all care at St. Luke's Boise Medical Center.

35.     Neither Dr. Erickson nor any St. Luke's employee-initiated contact with child welfare or any other division of DHW regarding the Infant's hospitalization.

**The Infant's Parents Fail to Attend Follow-Up Appointments**

36.     Following discharge, St. Luke's tried to arrange a visit at the Infant's home on March 5 and March 6, 2022.  However, the Infant's parents did not return their phone calls.

37.     On March 7, 2022, the Infant's parents attended a follow-up appointment with the Infant's new primary care provider (PCP), who is not affiliated with St. Luke's.  The appointment revealed the Infant ████████████████████████████████████████
████████████████████████.  A follow up appointment was scheduled for March 10, 2022.

38.     The parents attended the March 10, 2022, appointment.  Again, the appointment revealed the Infant ████████████.  The PCP asked the Infant's parents to bring the Infant back for ████████████ on March 11, 2022.

39.     The Infant's parents failed to bring the Infant to the ████████████████ on the morning of March 11, 2022.  When the family failed to appear for ████████████, the Infant's PCP referred the situation to DHW.

40.     After hearing from the PCP, DHW determined that the Infant was in immediate danger involving a life threatening and/or emergency situation.  DHW notified the Meridian

Police Department in accordance with DHW's standard practice.  The Meridian PD began trying to locate the Infant.

41.     Later on March 11, 2022, DHW reached out to NP Jungman, a nurse practitioner at St. Luke's CARES (Children at Risk Evaluation Services).  The DHW safety assessor asked NP Jungman for a consult on the Infant's Priority I referral.  NP Jungman reviewed the medical records from the Infant's initial admission, the Priority I referral, and the additional information provided from DHW, and advised DHW and the Meridian PD that the Infant be brought in for evaluation on March 11, 2022.  She told DHW and the Meridian PD that if the family wanted to bring the Infant to St. Luke's CARES voluntarily, she would stay late that afternoon to save the family another visit to the ER.  NP Jungman did not medically diagnose the Infant.

42.     The Meridian PD continued to try and get a response from the parents and tried to locate the Infant.

43.     That afternoon, DHW spoke by phone to the Infant's father, who said that the Infant and the Infant's mother were sleeping, but that they would come to CARES when they woke up.  Despite the representation from the Infant's father, the Infant was not brought to CARES.

**Police Take Custody of the Infant**

44.     Later on March 11, 2022, Meridian police went to the family's residence to check on the Infant's safety.  The family refused to cooperate, provide information, or let the officers see the Infant, forcing the police to get a warrant.

45.     Defendant Rodriguez stated he was present when the police visited the residence and was aware, at least by the time of the visit, that the police were looking for the Infant out of concern for the Infant's health.

46.     Rodriguez took no steps to assist the police in obtaining information regarding the Infant.

47.     When the police left the house to get a warrant, the Infant and the Infant's parents moved to another location.

48.     Believing the Infant was at risk of imminent harm due to the Infant's ███ ███████████, the parents' failure to follow medical advice, and the family's refusal to provide the police with information, the Meridian PD alerted its officers that the Infant was in danger and instructed them to look for the parents' vehicle.

49.     The police located the Infant and the Infant's parents late on the night of March 11, 2022, in Garden City.  When the Infant's parents refused to cooperate, the police took custody of the Infant and transported the Infant to St. Luke's Meridian in an ambulance.

50.     At the time the Infant was taken into custody, the parents were informed that there would be a court hearing within 48 hours and that the ultimate objectives were to assure the safety of the Infant and keep the family unit intact.

51.     The St. Luke's Parties had no authority regarding, did not participate in, and played no role regarding how the Infant was taken into custody.

**The Infant ███████ at St. Luke's Boise**

52.     In the early hours of Saturday, March 12, 2022, providers at St. Luke's Meridian evaluated the Infant and quickly decided to transfer the Infant to the pediatric floor of the St. Luke's Boise Medical Center for ██████████.

53.     When the ten-month-old Infant was admitted to St. Luke's in Boise for a second time, the Infant ████████████████████████████████.  The Infant had ████████ ████████████████████████████ eight days earlier.  The Infant's ████████████

██████████████████████████████████████████████████████

██   The Infant's ███████████████████.  The Infant's █████████████████████.  The

Infant had ████████████████████████████████████████████.

The Infant's ██████████████████████████████ from March 4 to

March 11, 2022.

54.     Once again, St. Luke's █████████████████████████

████████   The Infant's ███████████.  The Infant began █████████.

55.     St. Luke's providers gave the Infant's parents detailed updates on the Infant's

██████████████████.  But despite the Infant's ██████████████, the parents refused to

provide medical information, including birth records, newborn screening, and prior medical

records.  The Infant's parents stated that they were withholding the medical information on

advice from their attorney.

56.     St. Luke's updated the Infant's parents on the Infant's status throughout the

Infant's treatment.  The Infant's parents consented to the Infant's treatment plan.

57.     Contrary to Defendants' statements, St. Luke's did not vaccinate the Infant

against the wishes of the parents.  The St. Luke's Parties did not "harm [the Infant] in irreparable

ways."  Nor did they "abuse" the Infant.  As explained below, such statements were false and

were intended to attract media attention, incite followers, collect donations, disrupt hospital

operations, and defame the St. Luke's Parties.

**The Infant is Discharged and Returned to His Family**

58.     Once again, ████████████████████████████████████

████████████.  On March 15, 2022, St. Luke's discharged the Infant as the Infant was

████████████████████████████████████, and healthy enough for outpatient care.

St. Luke's decision to discharge the Infant was purely based on the Infant's medical condition, not the ongoing protests, pressure, or threats from Defendants or their followers discussed below.

59.     The court proceedings relating to the Infant are confidential.

60.     St. Luke's discharged the Infant to DHW, which in turn released the Infant to his parents on March 18, 2022.

**Defendants Create a False Narrative**

61.     As alleged above, St. Luke's doctors treated the Infant's ████████████ ████████████ .  The Infant was returned to the parents.  DHW acted to ensure the safety of the Infant and pursued the goal of returning the Infant to the parents.  The confidential court proceedings provided for by statute occurred.

62.      Nevertheless, Bundy, Rodriguez, and the other Defendants chose to exploit the events surrounding DHS's intervention and the Infant's care to enhance their standing and to profit financially.

63.     Defendants' prestige, political influence, personal brands, "business," and revenue all depend on Defendants' ability to market themselves as leaders in the fight against governmental overreach. The size of the membership of PRN, and, in turn, the amount of revenues flowing to the Bundy Campaign, Bundy's Dono Custos and Abish-husbondi entities, and Rodriguez's Freedom Tabernacle all depend on Defendants' efforts to market themselves as champions fighting against government conspiracies. Likewise, the more Rodriguez is able to raise his profile among his target market, the better chance he has to sell his followers services through Power Marketing.

64.     Defendants perceived the events surrounding DHW's intervention as an opportunity to spread their lies and further their agendas.  They realized that the facts

surrounding DHW's intervention could be mischaracterized as a governmental conspiracy to kidnap, traffic, and kill children.  Then, in turn, Defendants realized they could establish themselves as crusaders against their falsely manufactured governmental conspiracy.

65.     To that end, Defendants worked together to manufacture a false narrative of a state-sponsored child kidnapping and trafficking ring that included DHW, the police, the Idaho Judiciary, the Governor of Idaho, the Infant's PCP, and the St. Luke's Parties.

66.     In support of their wrongful objectives, Defendants defamed the supposed members of the kidnapping and child trafficking ring and then incited their followers by stating that countless children, like the Infant, would be kidnapped, trafficked, and potentially killed unless immediate action was taken to destroy the St. Luke's Parties and others.

67.     Defendants acted in concert to disseminate this false narrative.  Evidence indicates that Bundy, Rodriguez, and the other Defendants coordinated talking points and the timing of demonstrations and provided the same directions to followers regarding how to disrupt the St. Luke's Parties.  They told their followers to target the same individuals for doxing and harassment.  Defendants mirrored false statements across the websites and social media they controlled.

68.     Defendants operated as a single enterprise to defame and harm the St. Luke's Parties and others.

**Defendants Knowingly Harmed the St. Luke's Parties**

69.     Defendants were aware of the likely impact of their joint actions.  When they developed their plan, Bundy, Rodriguez, and the other Defendants knew that spreading their false claims would result in damage to the St. Luke's Parties, including death threats, business interruption, trespass, reputational damage, menacing crowds, and potentially mob violence.

70.     Despite foreseeing the consequences, Bundy, Rodriguez, and the other Defendants acted to maximize harm and damage.  As Rodriguez bragged publicly, Defendants wanted to harass and shame the St. Luke's Parties with claims of child kidnapping and murder such that St. Luke's employees would be shunned by their families and lose their careers, while St. Luke's itself would be run out of business.  Bundy, Rodriguez, PRN and the other Defendants intended or acted recklessly to enflame followers so there would be violence or, at least a real threat of violence against the St. Luke's Parties.

71.     Bundy, Rodriguez, and the other Defendants knew that a legal process existed to address the custody and welfare of the Infant. Bundy and Rodriguez were involved in and kept informed of all legal proceedings relating to the Infant.

72.     Defendants knew their harassment and threats of violence they generated would not deter those targeted from doing what was best for the Infant.  They knew that the judge would not be cowed into changing how she would rule in the case.  They knew that DHW would not act contrary to what it believed was in the best interest of the Infant.  They knew the St. Luke's Parties would not discharge the Infant until the Infant was medically ready for discharge. And they knew the St. Luke's Parties did not have the authority to determine whether the Infant would be discharged home or to a foster family.

73.     Despite knowing that DHW, the trial court, and the St. Luke's Parties would not be threatened into abandoning the law or the Infant's best interests, Defendants engaged in their coordinated false statements and wrongful acts.  Defendants did so because their wrongful acts were motivated by other goals.

74.     The facts and circumstances indicate that Defendants' motives in creating and disseminating the false kidnapping and child trafficking narrative included, but are not limited to

the following goals: (1) generating support for the Bundy Campaign; (2) raising and monetizing the political profiles and personal brands of Bundy and Rodriguez, especially within the People's Rights Network and other political groups; (3) driving web traffic to sites controlled by Defendants; (4) solidifying control over their followers; (5) creating financial gain in the form of payments to and donations to Bundy's campaign, PRN, Rodriguez's PAC, and a fund that was established for Rodriguez's family; (6) generating more revenue for Rodriguez's Power Marketing entities and his Freedom Tabernacle Incorporated; and (7) generating more money for Bundy's entities, including Dono Custos and Abish-husbondi.

**False Narrative Regarding DHW's Intervention**

75.     Understanding the need to create a narrative that served a larger conspiracy theory, Rodriguez misrepresented the circumstances that led to DHW's intervention regarding the Infant.  Among other things, Rodriguez, with assistance from the other Defendants, falsely asserted that the Infant was not at risk and had a "100% clean bill of health" when taken into custody, that the parents had only missed a single medical appointment, and that Dr. Erickson had reported the parents and the Infant to DHW.

76.     In truth, Rodriguez knew or should have known that the Infant was ▓▓▓▓▓ and faced significant ▓▓▓▓▓▓.  Rodriguez knew the parents had failed to follow several steps needed to ensure the Infant was receiving needed medical care and failed to respond to those properly seeking information regarding the health of the Infant.  Rodriguez further understood that he had no factual basis to assert that Dr. Erickson had contacted DHW.  Dr. Erickson never contacted DHW regarding the Infant.

**Bundy Trespasses at St. Luke's Meridian to Generate Publicity and Contributions**

77.     Bundy has a history of forcing confrontation with police to generate publicity for himself and his political agenda and in order to make money for himself.

78.     Shortly after the police took the Infant into custody, Bundy was made aware and took action to garner publicity and, in turn, make money for himself.

79.     When Bundy learned that police had transported the Infant to St. Luke's in Meridian, Bundy and a group of his followers travelled to the hospital for the purpose of initiating a conflict with the police and potentially getting arrested.  He knew that by orchestrating a protest and arrest at the hospital that he would win media attention, enhance his brand, and likely generate financial contributions for himself and the Bundy Campaign.

80.     On Saturday, March 12, 2022, at around 1:30 a.m., Bundy and his followers entered the ambulance bay at St. Luke's in Meridian—a primary access point for medical emergencies.  Once there, the group yelled and cursed at hospital staff and uniformed police officers.  As Bundy planned, his followers were prepared with their cameras and immediately shared the confrontation Bundy manufactured on social media.

81.     St. Luke's security guards recognized Bundy, based on his actions and direction of the crowd, as "the catalyst and aggressor in the group."

82.     Hospital staff explained to Bundy and his followers that the group was blocking emergency access to the ambulance bay and asked them to move to a nearby area where they would not block patient access.  Following Bundy's lead, the group refused to move and continued to harass hospital staff.

83.     Hospital staff told Bundy and his followers that they would be trespassing if they stayed in the ambulance bay.  Once again, the group refused to leave.

84.     Recognizing that Bundy's followers were growing more numerous and menacing, a hospital supervisor tried to reason with Bundy and deescalate the situation.  For the benefit of those there to film him, Bundy responded by accusing the supervisor of kidnapping and then demanded that he give Bundy the Infant.  Bundy knew full well he had no legal authority to make that demand because he had no parental rights over the Infant and because the Infant had been taken into protective custody pursuant to Idaho law.

85.     Bundy knew that St. Luke's would not and could not as a matter of law release the Infant into Bundy's custody.

86.     Hospital staff repeatedly warned Bundy and his followers to clear the ambulance bay.  Bundy heard and refused to heed the warnings on at least three occasions.

87.     Bundy knew the police had no option but to arrest him for trespass.  As Bundy intended, the police arrested him just before 2:00 a.m. on March 12, 2022. Bundy was on the way to getting the publicity he craved.

88.     Bundy's followers recorded his arrest for social media and then dispersed.

89.     The police released Bundy a few hours after his trespass.

90.     Upon his release, Bundy immediately began to publicize his arrest.  In accordance with the messaging campaign developed by Rodriguez (a paid marketing consultant for the Bundy Campaign), Bundy mischaracterized the Infant as having been in good health, falsely stated the Infant had been kidnapped from his parents because a single appointment was missed, indicated the Infant's health was at risk in the hospital, falsely stated that he had been arrested for trespass without warning and justification, and directed his followers to the freedomman.org website which already contained messaging supporting the false kidnapping and child trafficking narrative.

91.     Shortly thereafter, the Bundy Campaign and PRN likewise began to publish the same false narrative regarding the Infant's care at St. Luke's and regarding Bundy's arrest at St. Luke's in Meridian.

**Concerted Effort to Disrupt St. Luke's Business**

92.     To further their false narrative, Defendants made false statements regarding the Infants' care and repeatedly defamed the St. Luke's Parties.  In addition, Defendants repeatedly told their followers that the St. Luke's Parties need to be punished and directed their followers on how to shame the St. Luke's Parties and disrupt St. Luke's operations. Defendants intended to incite or acted recklessly to incite followers and the public to threaten violence and to commit violence against the St. Luke's Parties. In particular, Bundy knew he had cultivated a personal following that was conditioned to see him as a leader and quasi-religious figure and that his participation in and endorsement of this false narrative would inspire threats of violence and likely real violence against the St. Luke's Parties by his followers.

93.     Defendants incited their followers by publishing patently untrue statements and providing direction to cause harm, including falsely stating the following:

a.      St. Luke's Parties were participating in a conspiracy to kidnap, traffic, sexually abuse, and kill children;

b.      St. Luke's Parties were running a child trafficking ring in order to profit from tax dollars;

c.      St. Luke's Parties were abusing and harming the Infant in irreparable ways;

d.      St. Luke's Parties harmed and killed babies all the time;

e.      St. Luke's Parties kidnapped the Infant and other children;

f.      St. Luke's Parties were "moronic imbeciles" who neglected the Infant;

g.      St. Luke's Parties stole the Infant;

h.      St. Luke's changed the Infant into someone who was unrecognizable, lethargic, and unresponsive;

i.      St. Luke's failed to keep the Infant clean;

j.      St. Luke's caused the Infant "suspicious" bruising;

k.      St. Luke's lied about the Infant's treatment;

l.      St. Luke's Parties vaccinated the Infant against the family's wishes;

m.      St. Luke's Parties were "medically negligent";

n.      St. Luke's was "world famous" for "mistreating people," "killing people," and "stealing babies from their parents";

o.      St. Luke's forced the Infant to take "toxic poison" which was then allowed to stay in the Infant's body for days;

p.      St. Luke's Parties changed and falsified information in the medical records to protect themselves;

q.      Mr. Roth was guilty of criminal accessory of child abduction and deprivation of rights under color of law;

r.      Mr. Roth personally profited from the pandemic;

s.      Dr. Erickson was responsible for the Infant's kidnapping;

t.      Dr. Erickson participated in kidnapping "hundreds of children" with the help of a judge;

u.      The Infant "possibly could lose his life because of the decisions of people [at St. Luke's] who don't even care" about the Infant;

v.      The hospital made the Infant "more sickly";

w.      Followers should put "physical pressure" on those "that are causing the problem";

x.      Followers should disrupt St. Luke's operations by protesting, calling in, donating money, making noise, and giving the hospital "hell";

y.      God should "crush the necks of those that are evil."

94.    Defendants caused disruption to St. Luke's operations, harmed staff and patients, and impaired patient care inside the hospital.

95.     Between March 12 and March 17, 2022, Defendants Bundy, Rodriguez, PRN and the other Defendants called on their followers to protest at St. Luke's in Boise, to demand the return of the Infant, and to prevent transfer of the Infant from the hospital into foster care.  In response, crowds, many of whom carried firearms, began to join Bundy and Rodriguez at the hospital in a concerted effort to disrupt the hospital's operations and intimidate hospital staff and patients.

96.     Rodriguez became a daily presence at the hospital.  Rodriguez conducted defamatory "press conferences" outside the St. Luke's Boise hospital.

97.     Incited by Defendants, the crowd of followers harassed patients and staff, and disrupted patient care.  Patients reported feeling anxious and fearful because of Defendants' noisy and menacing protests.

98.     On March 15, 2022, Defendants went so far as to cause St. Luke's to go into lockdown for more than an hour.  During this time, nurses, doctors, and other employees could not enter or exit the building.  St. Luke's directed patients to other facilities and rerouted ambulances to other sites.

99.     Defendants also organized a campaign of technological disruption.  They encouraged their followers to flood St. Luke's phone lines and email inboxes in an effort to shut down St. Luke's operations.  Defendants' followers jammed phone lines with menacing calls (including death threats), sent threatening emails, and sent spam emails to disrupt servers. Using his notoriety, Bundy repeatedly directed his followers to disrupt St. Luke's operations.

**Solicitations for Donations to Rodriguez's Family**

100.    Concurrently while acting to harm the St. Luke's Parties, Rodriguez, with help from the other Defendants, solicited money based on false representations relating to the Infant,

the circumstances leading to DHW's intervention, the parents' financial condition, and the St. Luke's Parties.

101.    A center piece in almost every one of Rodriguez's media appearances was a solicitation for donations to his family members, the parents of the Infant.  Likewise, the solicitation for donations was advertised on peoplesrights.org and freedomman.org.

102.    These solicitations for charitable contributions were made based on the defamatory statements about the St. Luke's Parties and others kidnapping, trafficking, and killing children.

103.    The solicitations were also premised on false statements regarding the parents' liability for the medical care provided by SLHS, SLRMC, and Dr. Erickson.  Rodriguez repeatedly stated that the St. Luke's Parties were performing unnecessary medical tests and treatments on the Infant, unnecessarily extending the Infant's time at the hospital to increase costs, and extorting the Infant's parents.  These statements were false.

104.    As Rodriguez knew or recklessly failed to learn, the parents did not have significant financial liability relating to the ███ care.  While the Infant's ███████████ ████████████████████████ and the parents were uninsured, governmental assistance and St. Luke's policies alleviated any significant financial burden.

105.    While the Infant was ███████████, the Infant's parents were made aware that significant costs were being covered by government assistance.  St. Luke's also took steps to assist the parents in minimizing the financial impact of the healthcare provided to the Infant.  For example, when the Infant's parents expressed concerns about paying for the hospital stay during the Infant's first admission, a St. Luke's employee screened the family and informed them that they likely qualified for Medicaid assistance.

106.     A patient care coordinator passed their concerns along to a patient financial advocate (PFA), and the PFA spoke with the Infant's mother on March 2, 2022, to discuss financial assistance options.  The PFA screened the family for Medicaid and advised the Infant's mother that, given their reported family income, the Infant qualified for Children's Health Insurance Plan (CHIP) under Medicaid.  The employee later tried to call the Infant's parents on March 3, 2022, and March 8, 2022, to offer further assistance, but the parents did not answer or return the calls.

107.     Medicaid covered the Infant's medical bills for both ER visits and admissions. Despite absence of insurance, the Infant's family does not have any outstanding balance due to St. Luke's. The Infant's family never paid anything for and owe nothing for the care the Infant received at St. Luke's, including the care received during the hospital stay March 1-4, 2022 which was initiated by the Infant's parents.

108.     Despite knowing that the Infant's parents had not incurred significant liability for the medical care received at SLRMC, Rodriguez, assisted by the other Defendants, continued to solicit donations, and received more than $115,000 based on misrepresentations that the St. Luke's Parties had engaged in wrongdoing and that St. Luke's had created huge financial liability for Rodriguez's family.

**Defendants Used the False Narrative to Market PRN and Other Business Ventures**

109.     Defendants used their false narrative regarding the Infant to market PRN.

110.     Defendants repeatedly misrepresented that the Infant was released to the Infant's parents based on the fact that PRN had acted to disrupt the operations of the St. Luke's Parties and acted to intimidate and threaten the St. Luke's Parties.

111.     Defendants made these false statements knowing that the Infant was released in accordance with the judicial proceedings, because St. Luke's was able to stabilize the Infant's medical condition, and because protections wereput in place to protect the Infant's health going forward.

112.     Defendants knew that PRN and the other Defendants did not assist with or accelerate the release of the Infant to the parents. Defendants knew that their actions had actually slowed and complicated the process of returning the Infant to the parents. Nevertheless, Bundy and Rodriguez and the other Defendants committed to selling the false narrative to grow membership in PRN and to make money off members who were directed to make payments to Rodriguez's Freedom Tabernacle entity and/or Bundy's Dono Custos entity.

113.   In fact, even after the Infant was returned to the Infant's parents, Rodriguez and Bundy have continued to exploit the Infant by incessantly marketing the Infant and his likeness through social media and alternative media to promote PRN, Bundy in campaign advertising, and Rodriguez and his multiplicity of sales schemes.

**Defendants Continue to Defame and Call for Harassment**

114.     Defendants' efforts to disrupt and dismantle St. Luke's and defame Plaintiffs did not stop when the Infant was discharged.

115.     Seeking to continue to benefit politically and financially from the false conspiracy Defendants manufactured, Rodriguez recently created the group "People Against Child Trafficking."

116.     On March 26, 2022, Bundy and Rodriguez organized a rally on property owned by one of Bundy's companies.

117.    The rally was heavily advertised by Defendants and was exploited as a

fundraising event by the Bundy Campaign.

118.    During the March 26, 2022, rally, Defendants continued to make false,

defamatory statements about the St. Luke's parties, including the following:

>   a.    Defendant Rodriguez stated Dr. Erickson kept the Infant in the hospital to "rack[] up the bill" while displaying defamatory images of Dr. Erickson on a large movie screen;
>
>   b.    Defendant Rodriguez stated the St. Luke's Parties engaged in kidnapping and child trafficking for money;
>
>   c.    Defendant Rodriguez indicated that the St. Luke's Parties were taking part in the "greatest child trafficking ring in the history of the world"; and
>
>   d.    Defendant Bundy described the St. Luke's Parties as equivalent to rapists, comparing the St. Luke's Parties to "feudal lords" practicing "primae noctis";[1]

119.    At the March 26, 2022, rally on the Bundy Property, Rodriguez bragged about

shutting down St. Luke's phones system such that St. Luke's "couldn't even operate."

120.    At the March 26, 2022, rally, Defendants used defamatory speech to incite people

to join PRN and to take the fight against the St. Luke's Parties and other supposed kidnappers

and child traffickers "all the way to the end."

121.    The defamatory statements made at the March 26, 2022, rally were streamed and

the video was later posted to social media sites and to websites controlled by Defendants.

122.    Defendants continue to defame the St. Luke's Parties, including but not limited to

publishing or making the following false, misleading, and defamatory statements.

---

[1] Primae Noctis names an ancient tradition in which all noble lords had the right to have sex with any female subject, regardless of her will, and even with a virgin bride on her wedding night. https://www.dictionary.com/e/historical-current-events/prima-nocta/#:~:text=Prima%20nocta%20is%20the%20semi,particularly%20on%20her%20wedding%20night.

123.    Defendant Bundy falsely and publicly reaffirmed that all of his prior public statements about Plaintiffs were true.

124.    Defendant Bundy falsely and publicly accused St. Luke's of taking the Infant.

125.    Defendant Bundy falsely and publicly accused St. Luke's of taking other peoples' children.

126.    Defendant Rodriguez falsely and publicly accused St. Luke's of being involved in a child trafficking network and kidnapping children.

127.    Defendant Rodriguez falsely and publicly accused St. Luke's of profiting off of the false kidnapping of the Infant.

128.    Defendant Rodriguez falsely stated in emails in support of a web site he is creating that St. Luke's is corrupt and wicked and is involved in extortion harming Idahoans every day.

129.    Defendant Rodriguez falsely stated on a website of his creation that St. Luke's and its CEO Mr. Roth are corrupt, wicked, and commit extortion every day.

130.    Defendant Rodriguez, Bundy, and PRN have repeatedly made the false statements that Plaintiffs participated in a conspiracy with DHW and Governor Little to kidnap and traffic the Infant in retaliation for Bundy's political opposition to government actions taken to mitigate the COVID-19 pandemic.

131.    In a video that he produced and promoted widely on the internet on or about February 10, 2023, Bundy falsely stated that Dr. Erickson misdiagnosed the Infant and called CPS.

132.    In a video that he produced and promoted widely on the internet on or about February 10, 2023, Bundy falsely stated that Chris Roth was an accessory to child abduction.

133.    In a news article published in the Idaho Press on or about February 10, 2023, Bundy falsely stated that Dr. Erickson misdiagnosed the Infant.

134.    In an interview on or about January 27, 2023, which was posted and promoted on the internet, Bundy falsely stated that St. Luke's misdiagnosed the Infant multiple times, three times while in the hospital's care.

135.    On or about January 17, 2023, Bundy published "Come No More Upon Me, A Warning Letter from Ammon Bundy" ("Come No More Threat") on the PRN website and on other websites which contains a number of false statements, including, but not limited to, false statements that:  (1) the Infant was taken into protective custody as part of a conspiracy involving St. Luke's and government officials which targeted Bundy; and (2)  that he was forced to sell his home because St. Luke's put a lien on the property.

136.    Further, Bundy and PRN updated the "Come No More Threat" numerous times between January 17, 2023 and February 10, 2023 to make additional threats and false statements, including, but not limited to:  (1) that "the Senior Executives at St. Luke's are getting away with committing horrible crimes against children in Idaho . . ."; and (2) that St. Luke's negotiated with him regarding his criminal trespass.

137.    Defendant Bundy made numerous false public statements that the Infant was neglected while in St. Luke's care. Among other places, Bundy made these false statements on or around February 9, 2023 on the internet video blog entitled "The Pete Santilli Show".

138.    Defendant Rodriguez has repeatedly used hate speech directed at the LGBTQ+ community while making false statements in widely disseminated interviews that St. Luke's participates in a conspiracy to kidnap babies from Godly, Christian families in order to traffic the babies to "homos" who are likely to abuse or kill the stolen babies.

139.   Defendant Rodriguez falsely stated St. Luke's is involved in child trafficking, and

in any number of wicked and heinous offenses against society and people of faith, specifically.

## COUNT I
### (DEFAMATION (LIBEL AND SLANDER)—
### ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

140.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

141.   Defendants have published false, misleading, and defamatory statements about

Plaintiffs directed to third parties including, but not limited to:

a.   Defendant Rodriguez falsely and publicly accused St. Luke's of being "world famous" for "mistreating people," "killing people," and "stealing babies from their parents."

b.   Defendant Rodriguez falsely and publicly accused St. Luke's of forcing the Infant to take "toxic poison."

c.   Defendant Rodriguez falsely and publicly accused Plaintiffs of participating in an "organized crime ring" and "harming" the Infant.

d.   Defendants falsely and publicly accused Plaintiffs of kidnapping children.

e.   Defendants repeatedly told their followers and supporters to disrupt St. Luke's operations by protesting, calling in, donating money, and making noise.  Followers heeded these commands, resulting in serious threats to Plaintiffs.

f.   Defendant PRN published a wanted poster featuring a headshot of Mr. Roth with the caption: "WANTED: Chris Roth, President/CEO of St. Luke's."  Under the headshot, the website falsely accused Mr. Roth of "Criminal accessory of child abduction and deprivation of rights under color of law."  Defendants encouraged protestors to make signs using this image.

g.   Defendant FMP published a list of pictures under the heading: "Main People Responsible for ▮▮▮▮▮▮ Kidnapping."  Dr. Erickson's picture was the first on the list.  FMP then falsely stated that Dr. Erickson "was the first to call CPS" and accused her of being "the initial trigger that got everything started."  FMP later added NP Jungman to the list.

h.   Defendant Rodriguez falsely and publicly stated that Dr. Erickson "had a panic attack and literally sent a CPS worker or social worker to [Rodriguez's] daughter's hospital room to interview her."

i.      Defendant Rodriguez falsely and publicly stated that Dr. Erickson is incompetent at her profession, stating the "hospital doesn't understand even the basic common-sense things that anybody understands."

j.      Defendants FMP and Rodriguez published the false statement that experts at St. Luke's "harm and kill babies all the time."  This false accusation is intended to defame doctors at St. Luke's including Dr. Erickson.

k.      Defendant Bundy falsely and publicly accused Judge Fortier of taking "hundreds of children . . . with this Doctor Natasha D. Erickson."

l.      Defendants FMP and Rodriguez published the false statements that NP Jungman "personally financially benefitted from this Child trafficking" and that she "takes innocent little children that have just been ripped from their families and starts looking at and asking them about their privates."

m.      Defendants FMP and Rodriguez published a false statement implying that NP Jungman committed "medical malpractice."

n.      Defendant Rodriguez falsely stated that St. Luke's was involved in kidnapping the Infant for a profit.

o.      Defendant Rodriguez stated that St. Luke's is connected to a medical mafia.

p.      Defendant Bundy falsely stated that Dr. Erickson misdiagnosed the Infant.

q.      Defendant Bundy falsely stated that Chris Roth and Dr. Erickson are the ones who took the Infant from his parents.

r.      Defendant Bundy falsely stated that St. Luke's misdiagnosed the Infant multiple times.

s.      Defendant Bundy falsely states that St. Luke's mistreated and neglected the Infant while the Infant was in their care.

t.      Defendant Bundy falsely stated that St. Luke's targeted the Infant for kidnapping because of Bundy's opposition to COVID "corruption".

u.      Defendant Rodriguez falsely stated St. Luke's is involved in child trafficking, and in any number of wicked and heinous offenses against people of faith, specifically.

142.    These statements were false.

143. At the time Defendants made the statements, they knew the statements were false, or made the statements with reckless disregard for their truth and made such statements with malice.

144. Defendants' statements were not subject to privilege or justified communications.

145. Defendants made or published the statements with the purpose of defaming or disparaging Plaintiffs, in an effort to injure Plaintiffs' business and reputation.

146. Defendants make these false statements in an effort to benefit themselves financially.

147. Defendants' statements involve false allegations of criminal activity and/or involve matters incompatible with business, trade, profession, or office, and are defamatory *per se*.

148. In particular, Defendant Bundy made false statements directed at Dr. Erickson which involve matters incompatible with business, trade, profession, or office, and are defamatory *per se*.

149. Defendants made false statements that Plaintiffs were committing crimes and wrongful acts against Christians or people of faith intending that those false statements would increase the likelihood of their followers or other members of the public would harass and/or commit violence against Plaintiffs.

150. Defendants Rodriguez and Defendant FMP used hate speech directed at the LGBTQ+ community in their false statements against Plaintiffs intending that those false statements would increase the likelihood that their followers or other members of the public would harass and/or commit violence against Plaintiffs.

151.    As a direct and proximate result of Defendants' publication of such statements, Plaintiffs have suffered economic and non-economic harm in an amount to be proven at trial.

152.    Because Defendants' statements were made knowingly, intentionally, willfully, and/or maliciously, Plaintiffs seek punitive damages in an amount to be proven at trial.

## COUNT II
### (INVASION OF PRIVACY—MR. ROTH, DR. ERICKSON, AND NP JUNGMAN AGAINST ALL DEFENDANTS)

153.    Plaintiffs Mr. Roth, Dr. Erickson, and NP Jungman incorporate the foregoing allegations as if fully set forth herein.

154.    Through their actions described above, Defendants have published materially false statements concerning Mr. Roth, Dr. Erickson, and NP Jungman to third parties.

155.    These statements were false.

156.    These statements placed Mr. Roth, Dr. Erickson, and NP Jungman in a false light in the public eye.

157.    At the time Defendants made the statements, they knew the statements were false, or made the statements with reckless disregard for their truth and made such statements with malice.

158.    Defendants' statements were not subject to privilege or justified communications.

159.    As a direct and proximate result of Defendants' publication of such statements, Mr. Roth, Dr. Erickson, and NP Jungman have suffered damages in an amount to be proven at trial.

160.    Because Defendants' actions were done knowingly, intentionally, willfully, and/or maliciously, Mr. Roth, Dr. Erickson, and NP Jungman seek punitive damages in an amount to be proven at trial.

## COUNT III
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS—
### MR. ROTH, DR. ERICKSON, AND NP JUNGMAN AGAINST ALL DEFENDANTS)

161.    Plaintiffs Mr. Roth, Dr. Erickson, and NP Jungman incorporate the foregoing allegations as if fully set forth herein.

162.    Through their actions described above, Defendants engaged in extreme and outrageous conduct that went beyond all possible bounds of decency in a civilized society.

163.    Defendants' conduct was intentional or reckless.

164.    As an actual or proximate result of Defendants' wrongful conduct, Mr. Roth, Dr. Erickson, and NP Jungman suffered the requisite injuries.

165.    As a direct and proximate result of Defendants' wrongful conduct, Mr. Roth, Dr. Erickson, and NP Jungman have suffered damages in an amount to be proven at trial.

166.     Because Defendants' actions were done knowingly, intentionally, willfully, and/or maliciously, Mr. Roth, Dr. Erickson, and NP Jungman seek punitive damages in an amount to be proven at trial.

## COUNT IV
### (TRESPASS-SLHS AND SLMRC AGAINST BUNDY AND RODRIGUEZ)
### (COMMON LAW)

167.    Plaintiffs SLHS and SLRMC incorporate the foregoing allegations as if set forth fully herein.

168.    Defendant Bundy entered the ambulance bay at St. Luke's Meridian property on Saturday, March 12, 2022.

169.    Defendant Bundy did not have permission to be in the ambulance bay at St. Luke's Meridian property.

170.    Defendant Bundy remained in the ambulance bay at St. Luke's Meridian property after being instructed to leave and blocked access to the ambulance bay.

171.    The ambulance bay at St. Luke's Meridian property is restricted to authorized medical and emergency personnel.

172.    Defendant Bundy's presence in the ambulance bay at St. Luke's Meridian property interfered with St. Luke's ability to provide medical care to patients and conduct its business.

173.    Defendants Bundy and Rodriguez entered St. Luke's Boise property on Tuesday, March 15, 2022, while leading a large crowd for the express purposes of disrupting hospital operations and generating publicity for a political cause that benefited Defendants and generating revenue for Defendants.

174.    Defendants Bundy and Rodriguez did not have permission to enter or remain on St. Luke's Boise property because they were not seeking medical care or treatment and were not authorized visitors.

175.    Defendants Bundy and Rodriguez interfered with hospital staff, blocked public access to the hospital, and disrupted hospital operations.

176.    Defendants Bundy's and Rodriguez's presence at St. Luke's Boise property interfered with St. Luke's ability to provide medical care to patients and conduct its business.

177.    As a direct and proximate result of Defendants Bundy's and Rodriguez's actions, Plaintiff St. Luke's has suffered damages in an amount to be proven at trial.

**COUNT V**
**(TRESPASS-SLHS AND SLRMC AGAINST BUNDY AND RODRIGUEZ)**
**(STATUTORY TRESPASS PURSUANT TO I.C. § 6-202)**

178.    Plaintiffs SLHS and SLRMC incorporate the foregoing allegations as if set forth fully herein.

179.    Defendant Bundy entered the ambulance bay at St. Luke's Meridian property on Saturday, March 12, 2022.

180.     Defendant Bundy did not have permission to be in the ambulance bay at St. Luke's Meridian property.

181.     Defendant Bundy acted intentionally and willfully when he entered and remained in the ambulance bay at St. Luke's Meridian property.

182.     Defendant Bundy remained in the ambulance bay at St. Luke's Meridian property after being instructed to leave and blocked access to the ambulance bay.

183.     The ambulance bay at St. Luke's Meridian property is not open to the public and is not accessible by the public.  Entry into the ambulance bay is restricted to authorized medical personnel, emergency responders, and patients seeking emergency care.

184.     Defendant Bundy's presence in the ambulance bay at St. Luke's Meridian property interfered with St. Luke's ability to provide medical care to patients and conduct its business. Bundy took this action for an improper purpose.

185.     Defendants Bundy and Rodriguez entered St. Luke's Boise property on Tuesday, March 15, 2022, as protestors. Bundy and Rodriguez took these actions for improper purposes.

186.     Defendants Bundy and Rodriguez acted intentionally and willfully when they entered and remained present at St. Luke's Boise property.

187.     St. Luke's Boise property is open to the public who are actively seeking medical care or treatment.  St. Luke's lawfully restricts access to its Boise property to patients and authorized visitors only.

188.     Defendants Bundy and Rodriguez did not have permission to enter or remain on St. Luke's Boise property because they were not seeking medical care or treatment and were not authorized visitors.

189.     Defendants Bundy and Rodriquez interfered with hospital staff and patients,

blocked public access to the hospital, and disrupted hospital operations.

190.     Defendants Bundy's and Rodriguez's presence at St. Luke's Boise property

interfered with St. Luke's ability to provide medical care to patients and conduct its business.

191.     As a direct and proximate result of Defendants Bundy's and Rodriguez's actions,

Plaintiff St. Luke's has suffered damages in an amount to be proven at trial and should be

awarded attorneys' fees relating to this claim and pursuant to I.C. § 6-202(3)(a)(ii) (civil

trespass). In the event of default, SLHS and SLRMC each should be awarded damages for this

cause of action in an amount of no less than $250,000 from each Defendant, Bundy and

Rodriguez, and in addition, in the amount of $50,000 in attorneys' fees relating to this claim

from Bundy and Rodriguez.

## COUNT VI
## (UNFAIR BUSINESS PRACTICES—ALL PLAINTIFFS AGAINST DEFENDANTS BUNDY, RODRIGUEZ, AND FMP)

192.     Plaintiffs incorporate by reference each of the foregoing allegations as if set forth

fully herein.

193.     Defendants engage in political activism, the marketing of the personal brands of

Bundy and Rodriguez, and related business activities for financial gain.

194.     Ammon Bundy is in the business of generating revenue for himself, his political

campaign, the PRN, and other businesses he owns, such as Abish-husbondi, Inc. and Dono

Custos, Inc, by marketing his personal brand as a political activist and leader to garner donations,

revenues, and fees.

195.     Rodriguez generates revenue for himself and his businesses through his personal

brand, his political activism, the FM PAC, FMP, sale of his self-published books, speaking

engagements, provision of marketing services to the Bundy for Governor Campaign, and through

his consulting services sold through the Power Marketing entities. For example, Rodriguez exploits the likeness of the Infant and the notoriety created by the false narrative regarding the Infant to advertise Power Marketing.

196.    FMP owns and operates freedomman.org.  FMP generates revenue and/or other benefits for Rodriguez through traffic to the site and by serving as a marketing vehicle for Rodriguez's business ventures, including, but not limited to, Freedom Tabernacle Incorporated and the Power Marketing entities.

197.    SLHS and SLRMC are not-for-profit companies which provide medical services in Idaho.

198.    Mr. Roth is the CEO and President of SLHS.

199.    Dr. Erickson is a physician employed by SLRMC.

200.    NP Jungman is a nurse practitioner employed by SLRMC.

201.    In the conduct of trade or commerce and in seeking revenue for themselves, Bundy, Rodriguez, and FMP engaged in methods, acts, and practices unlawful under Idaho Code title 48, chapter 6, including, but not limited to, falsely disparaging the business and professional reputation of the St. Luke's Parties.

202.    Bundy, Rodriguez, and FMP knew, or in the exercise of due care should have known, that they engaged in unconscionable methods, acts, or practices in the conduct of trade or commerce, as provided in Idaho Code § 48-603C.

203.    The actions and practices of Bundy, Rodriguez, and FMP are misleading, false, or deceptive.

204.    Bundy's, Rodriguez's, and FMP's conduct and pattern of conduct are outrageous and offensive to the public conscience.

205.   As a direct result of these wrongful acts and practices, the St. Luke's Parties have been damaged more than $250,000.00, in an amount to be proven at trial.

**COUNT VII**
**(IDAHO CHARITABLE SOLICITATION ACT—ALL PLAINTIFFS AGAINST DEFENDANTS RODRIGUEZ AND FMP)**

206.   Plaintiffs incorporate by reference each of the foregoing allegations as if set forth fully herein.

207.   Defendants Rodriguez and FMP engaged in the solicitation of charitable contributions to the "Save ███████ from Medical Kidnapping" campaign. https://givesendgo.com██████

208.   Defendants Rodriguez and FMP solicited charitable contributions based on false statements regarding supposed medical bills owed to SLHS and SLRMC. In truth, the parents of the Infant never made any payments to SLHS or SLRMC for medical services and owe no money to SLHS or SLRMC for medical services as the medical services were covered by government programs.

209.   Defendant Rodriguez and FMP planned, conducted, and executed solicitations for charitable contributions by utilizing unfair, false, deceptive, misleading, or unconscionable acts and practices.

210.   In soliciting for charitable contributions, Rodriguez and FMP engaged in methods, acts, and practices unlawful under Idaho Code title 48, chapter 12, including, but not limited to, falsely disparaging the business and professional reputation of the St. Luke's Parties, manufacturing a false conspiracy of kidnapping, trafficking, and killing of children involving the St. Luke's Parties, and falsely representing the amount of liability incurred relating to medical expenses associated with treatment of the Infant.

211.     SLHS and SLRMC are not-for-profit companies which provide medical services in Idaho that were disparaged as part of the charitable solicitation.

212.     Mr. Roth is the CEO and President of SLHS who was disparaged and part of the charitable solicitation.

213.     Dr. Erickson is a physician employed by SLRMC who was disparaged as part of the charitable solicitation.

214.     NP Jungman is a nurse practitioner employed by SLRMC who was disparaged as part of the charitable solicitation.

215.     Rodriguez and FMP knew, or in the exercise of due care should have known, that they engaged in unconscionable methods, acts, or practices in the conduct of trade or commerce, as provided in Idaho Code § 48-603C, standards incorporated into the Idaho Charitable Solicitations Act.

216.     The actions and practices of Rodriguez and FMP relating to the solicitation of the charitable contributions were and continue to be misleading, false, or deceptive.

217.     Rodriguez's and FMP's conduct and pattern of conduct are outrageous and offensive to the public conscience.

218.     As a direct result of these wrongful acts, Rodriguez and FMP caused more than $115,000 to be donated wrongfully.

219.     As a direct result of these wrongful acts and practices, the St. Luke's Parties have been damaged owing to the false and defamatory statements to generate donations.

220.     As a direct result of these wrongful acts and practices, the public has been misled.

221.     Rodriguez and FMP should be assessed damages and attorneys' fees (pursuant to I.C. §§ 48-608, 48-1205), in an amount proven at trial pursuant to the purpose of the Idaho

Charitable Solicitations Act. In the event of default, Rodriguez and FMP should be forced to

disgorge at least $115,000 and pay attorneys' fees in the amount of $50,000 to Plaintiffs for fees

incurred relating to this claim.

## COUNT VIII
## (CIVIL CONSPIRACY TO COMMIT DEFAMATION, INVASION OF PRIVACY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, TRESPASS, UNFAIR BUSINESS PRACTICES, AND WRONGFUL CHARITABLE SOLICITATIONS—ALL PLAINTIFFS AGAINST DEFENDANTS)

222.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

223.    Defendants each willfully, intentionally, and knowingly agreed and conspired

with each other to publish false, misleading, and defamatory statements about Plaintiffs directed

to third parties, as described above.

224.    Defendants Rodriguez and Bundy further agreed and conspired to unlawfully

trespass on Plaintiff St. Luke's property.

225.    In furtherance of this conspiracy, Defendants defamed all Plaintiffs, invaded the

privacy of Mr. Roth, Dr. Erickson, and NP Jungman, intentionally inflicted emotional distress on

Mr. Roth, Dr. Erickson, and NP Jungman, unlawfully trespassed onto Plaintiff St. Luke's

property, committed unfair trade practices against all Plaintiffs, and defamed all Plaintiffs in

furtherance of a conspiracy to violate the Idaho Charitable Solicitation Act.

226.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have

suffered damages in an amount to be proven at trial.

227.    By virtue of the formation and operation of this conspiracy, Defendants, as

participants in the conspiracy, are liable as joint tortfeasors for each other's misconduct.

## REQUEST FOR JURY TRIAL

Pursuant to Idaho Rule of Civil Procedure 38, Plaintiffs hereby request trial by jury as to

all issues that are properly so tried.

## PRAYER FOR RELIEF

Counterclaimants respectfully request the following relief from this Court:

A.     An award to each of the St. Luke's Parties from each of the Defendants for damages in the sum to be proven at trial but in no event less than $250,000;

B.     Injunctive relief requiring the Defendants: (1) to cease posting and disseminating defamatory statements against the St. Luke's Parties; (2) to cease making statements that the St. Luke's Parties are criminals and/or participate in the kidnapping, trafficking, sexual or any other abuse, and/or killing of children; (3) to remove from all online locations Defendants have authority to do so any and all statements that the St. Luke's Parties are criminals and/or participating in the kidnapping, trafficking, sexual or any other abuse, and/or killing of children; (4) to cease disseminating and encouraging others to disseminate the contact information, personal information, and images of Mr. Roth, Dr. Erickson, and NP Jungman; and (5) to remove from all online locations Defendants have authority to do so the contact information, personal information, and/or images of Mr. Roth, Dr. Erickson, and NP Jungman.

C.     An award to the St. Luke's Parties of their reasonable attorneys' fees and costs for this matter under Idaho Code §§ 12-120(3), 12-121, 6-202(3)(a)(ii) (civil trespass), 48-608 (unfair business practices), and 48-1205 (Charitable Solicitation Act), or other applicable authorities and statutes;

D.     An award of punitive damages in the sum to be proven at trial; and

E.     Provide such other relief as the Court determines fair, just, and appropriate under the circumstances.

DATED this 3rd day of March, 2023.

HOLLAND & HART LLP

By: */s/Erik F. Stidham*
      Erik F. Stidham
      Jennifer M. Jensen
      *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2023, I caused to be filed and served, via iCourt, a true and correct copy of the foregoing by the method indicated below, and addressed to the following:

Ammon Bundy for Governor
P.O. Box 370
Emmett, ID 83617

☐ U.S. Mail
☒ Hand Delivered Via Process Server
☐ Overnight Mail
☐ Email/iCourt/eServe:

Ammon Bundy for Governor
c/o Ammon Bundy
4615 Harvest Ln.
Emmett, ID 83617-3601

☐ U.S. Mail
☒ Hand Delivered Via Process Server
☐ Overnight Mail
☐ Email/iCourt/eServe:

Ammon Bundy
4615 Harvest Ln.
Emmett, ID 83617-3601

☐ U.S. Mail
☒ Hand Delivered Via Process Server
☐ Overnight Mail
☐ Email/iCourt/eServe:

People's Rights Network
c/o Ammon Bundy
4615 Harvest Ln.
Emmett, ID 83617-3601

☐ U.S. Mail
☒ Hand Delivered Via Process Server
☐ Overnight Mail
☐ Email/iCourt/eServe:

People's Rights Network
c/o Ammon Bundy
P.O. Box 370
Emmett, ID 83617

☐ U.S. Mail
☒ Hand Delivered Via Process Server
☐ Overnight Mail
☐ Email/iCourt/eServe:

Freedom Man Press LLC
c/o Diego Rodriguez
1317 Edgewater Dr. #5077
Orlando, FL 32804

☒ U.S. Mail
☐ Hand Delivered
☐ Overnight Mail
☐ Email/iCourt/eServe:

Freedom Man Press LLC
c/o Diego Rodriguez
9169 W. State St., Ste. 3177
Boise, ID 83714

☒ U.S. Mail
☐ Hand Delivered
☐ Overnight Mail
☐ Email/iCourt/eServe:

Freedom Man PAC
c/o Diego Rodriguez
1317 Edgewater Dr., #5077
Orlando, FL 32804

☒ U.S. Mail
☐ Hand Delivered
☐ Overnight Mail
☐ Email/iCourt/eServe:

Diego Rodriguez                    ☐  U.S. Mail
1317 Edgewater Dr., #5077          ☐  Hand Delivered
Orlando, FL 32804                  ☐  Overnight Mail
                                   ☑  Email/iCourt/eServe:
                                   freedommanpress@protonmail.com


                                   */s/Erik F. Stidham*
                                   Erik F. Stidham
                                   OF HOLLAND & HART LLP

21008987_v1