# EXHIBIT D

Electronically Filed
8/11/2023 1:58 PM
Third Judicial District, Gem County
Shelly Tilton, Clerk of the Court
By: Rachel Puentes, Deputy Clerk

Erik F. Stidham (ISB #5483)
Robert A. Faucher (ISB #4745)
Anne E. Henderson (ISB #10412)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-5974
Telephone:  (208) 342-5000
Facsimile:  (208) 343-8869
Email:  efstidham@hollandhart.com
        rfaucher@hollandhart.com
        aehenderson@hollandhart.com

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF GEM

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD; CHRIS ROTH, an individual; NATASHA D. ERICKSON, MD, an individual; and TRACY W. JUNGMAN, NP, an individual,<br><br>      Plaintiffs,<br><br>vs.<br><br>AMMON BUNDY, an individual, AMMON BUNDY FOR GOVERNOR, a political organization; PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association, LISA BUNDY, an individual, and WHITE BARN ENTERPRISES LLC, an Idaho limited liability company,<br><br>      Defendants. | Case No.  CV23-23-0551<br><br>**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF**<br><br>**JURY TRIAL REQUESTED**<br><br>Assigned Judge:<br>Whiting, Brent L. |

St. Luke's Health System Ltd. ("SLHS") and St. Luke's Regional Medical Center, Ltd.

("SLRMC," and collectively with SLHS, "St. Luke's"), Chris Roth ("Mr. Roth"), Dr. Natasha D.

Erickson  ("Dr. Erickson"), and Tracy W. Jungman, NP ("NP Jungman"), collectively "St.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 1**

Luke's Parties" or "Plaintiffs," by and through their attorneys of record, Holland & Hart LLP,

hereby make the following Complaint for Avoidance of Fraudulent Transfers and Declaratory

Relief against the above-named Defendants and state and allege as follows.

## I.    NATURE OF THE CASE

1.      Defendants Ammon Bundy, the People's Right's Network ("PRN"), and the

Bundy for Governor Campaign ("Bundy Campaign") are collectively liable to the St. Luke's

Parties for $26,000,000 in compensatory and punitive damages owing to a jury verdict in the

matter of *St. Luke's Health Systems, Ltd., et al. v. Ammon Bundy, et al.*, Case No. CV01-22-

06789, Fourth Judicial District, State of Idaho, County of Ada (the "2022 Bundy Lawsuit"). In

total, as to all defendants to the 2022 Bundy Lawsuit, the jury returned a verdict of $52,000,000.

2.      The 2022 Bundy Lawsuit grew out of a significant grift that Ammon Bundy

initiated in March of 2022. Targeting both his existing followers and the broader public, Ammon

Bundy recklessly lied about and then exploited the dire, life-threatening medical condition of a

10-month-old infant ("Infant") to gain money and publicity for himself, his political campaign,

and his extremist organization, PRN.

3.      As established by the outcome of the 2022 Bundy Lawsuit, in furtherance of the

grift, Ammon Bundy, PRN, Bundy Campaign, and others acted in concert to create and

perpetuate a knowingly dishonest smear campaign that falsely claimed Idaho state employees,

the judiciary, the police, primary care providers, and the St. Luke's Parties engaged in

widespread kidnapping, trafficking, sexual abuse, and killing of Idaho children.

4.      To combat the damaging lies and false conspiracies Ammon Bundy was

spreading to fuel his grift, the St. Luke's Parties filed the 2022 Bundy Lawsuit on May 11, 2022.

The 2022 Bundy Lawsuit sought damages against Ammon Bundy, the Bundy Campaign, PRN,

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND
DECLARATORY RELIEF - 2**

Diego Rodriguez (Bundy's acolyte), Freedom Man Press LLC, and Freedom Man PAC based on a number of claims, including defamation and intentional infliction of emotional distress.

5. During the 14 months that the 2022 Bundy Lawsuit was pending, Ammon Bundy actively tried to derail the lawsuit without ever appearing in the case. He took disruptive actions and made threatening public statements to harass and intimidate witnesses, process servers, judges, the Gem County Sheriff, and the St. Luke's Parties.

6. Ammon Bundy also refused to follow the law throughout the 2022 Bundy Lawsuit. He failed to submit to a deposition, withheld documents subject to discovery requests, and repeatedly violated orders of the Court.

7. While the 2022 Bundy Lawsuit was pending, Ammon Bundy repeatedly made public statements boasting that he had taken actions to transfer assets to frustrate the ability of the St. Luke's Parties to collect any judgment they ultimately obtained against him.

8. Ammon Bundy, who controls both the Bundy Campaign and PRN, repeatedly stated, in video postings and in statements to extremist podcasters, that he was taking steps to hide his assets and frustrate collection efforts by the St. Luke's Parties. Ammon Bundy also indicated he was taking steps to frustrate the St. Luke's Parties' ability to collect against assets he controlled, including, but not limited to, the Bundy Campaign and PRN.

9. Ammon Bundy made several video posts in which he bragged about having hidden or transferred assets such that the only assets in his name were minimal, not exceeding a total of about $50,000. In effect, Ammon Bundy confessed, in videos that he posted while the 2022 Bundy Lawsuit was pending, that he had fraudulently conveyed or otherwise had taken steps to frustrate the St. Luke's Parties' ability to collect against the millions in assets, including real property, that he previously represented made up his considerable wealth.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 3**

10.     Because of their failure to appear and violations of Court Orders, all Defendants (including Ammon Bundy, PRN, and the Bundy Campaign) were defaulted in the 2022 Bundy Lawsuit.

11.     After a two-week damages trial in the 2022 Bundy Lawsuit, a jury awarded the St. Luke's Parties compensatory and punitive damages from all Defendants totaling $52,498,000. See **Exhibit A** (Jury Verdict) incorporated herein. Relevant to this complaint, the jury awarded the St. Luke's Parties $26,000,000 in compensatory and punitive damages from Ammon Bundy, the Bundy Campaign, and PRN. The Defendants in the 2022 Bundy Lawsuit were also found to be joint tortfeasors, and each defendant is jointly and severally liable for the entire $52,498,000 award.

12.     Since the jury verdict in the 2022 Bundy Lawsuit, Ammon Bundy has reiterated in public postings that he contends he "owes nothing" to the St. Luke's Parties and will not willingly pay the jury award.  Ammon Bundy's post-verdict statements indicate that he is continuing to take steps to frustrate the St. Luke's Parties' efforts to collect on the jury award from him, the Bundy Campaign, and PRN.

13.     On information and belief, since the filing of the 2022 Bundy Lawsuit, Ammon Bundy has transferred and hidden assets or directed others to transfer and hide assets of the Bundy Campaign and PRN to hinder or frustrate efforts by the St. Luke's Parties to collect damages.

14.     Upon information and belief, since the filing of the 2022 Bundy Lawsuit, Ammon Bundy has diverted, hidden, and concealed donations of cash and/or crypto currency intended for PRN to benefit himself and others involved in the smear campaign central to the facts underlying the 2022 Bundy Lawsuit.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 4**

15.     The St. Luke's Parties seek relief from Ammon Bundy's repeated and ongoing efforts to hide assets through fraudulent conveyances and other wrongful means.

## II.     PARTIES, VENUE, AND JURISDICTION

16.     At all times relevant hereto, Plaintiff SLHS was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho. SLHS is a Plaintiff in the 2022 Bundy Lawsuit.

17.     At all times relevant hereto, Plaintiff SLRMC was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho. SLRMC is a Plaintiff in the 2022 Bundy Lawsuit.

18.     At all times relevant hereto, Plaintiff Mr. Roth was and is President and CEO of SLHS and a resident of Idaho. Mr. Roth is a Plaintiff in the 2022 Bundy Lawsuit.

19.     At all times relevant hereto, Plaintiff Dr. Erickson was and is a physician specializing in pediatric medicine. She is an employee of SLRMC and a resident of Ada County, Idaho. Dr. Erickson is a Plaintiff in the 2022 Bundy Lawsuit.

20.     At all times relevant hereto, Plaintiff NP Jungman was and is a nurse practitioner specializing in pediatrics. She is an employee of SLRMC and a resident of Ada County, Idaho. NP Jungman is a Plaintiff in the 2022 Bundy Lawsuit.

21.     At all times relevant hereto, Defendant Ammon Bundy was and is a resident of Gem County, Idaho. Ammon Bundy is a Defendant in the 2022 Bundy Lawsuit.

22.     Ammon Bundy is a conflict entrepreneur; he generates money and publicity for himself by perpetuating false conspiracies and conflicts and, in turn, marketing himself as an anti-government, quasi-religious leader who valiantly opposes the same conspiracies and conflicts he is falsely perpetuating. Ammon Bundy controls the Bundy Campaign and is the

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 5**

founder and leader of the PRN. Through his control of the PRN, Ammon Bundy generates publicity for himself and directs donations to corporate entities, accounts, and crypto-currency wallets that he controls.

23.     Ammon Bundy owns and controls or owned and controlled at least two corporate entities (Dono Custos, Inc. and Abish-husbondi Inc.) through which he generates revenues for himself from his campaign and leadership of PRN. Dono Custos receives money directly from members of PRN. Revenues received by Dono Custos are used to benefit Ammon Bundy. Abish-husbondi received payments directly from the Bundy Campaign and those payments benefited Bundy personally. The potential revenue to Ammon Bundy is significant. If each member of PRN annually contributes just $50 to Ammon Bundy through Dono Custos, Ammon Bundy could pocket more than $3,000,000 per year. Ammon Bundy directed tens of thousands of dollars contributed to the Bundy Campaign to Abish-husbondi.

24.     The corporate personalities of Dono Custos and Abish-husbondi and Ammon Bundy are indistinguishable; Ammon Bundy exerts complete control over the entities and all decision making by the entities such that the entities operate as alter-egos of Ammon Bundy. Abish-husbondi and Dono Custos do not operate separately from Ammon Bundy, do not follow corporate formalities, and do not keep separate books.

25.     At all times relevant hereto, Defendant Bundy Campaign was and is an Idaho political organization formed for the ostensible purpose of raising money to support Ammon Bundy's effort to become Governor of Idaho. The Bundy Campaign is a Defendant in the 2022 Bundy Lawsuit.

26.     PRN is a Defendant in the 2022 Bundy Lawsuit.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 6**

27.     Founded and controlled by Ammon Bundy, Defendant PRN is an unincorporated association of over 60,000 members. Like Ammon Bundy, PRN does not recognize the government's authority over a person's "life, liberty, or justly acquired property." PRN is an unincorporated association controlled by Ammon Bundy which acts extra-judicially and uses doxing, harassment, economic disruption, and threats of violence to harass members of the community and political enemies and to enhance Ammon Bundy's personal and political power. At all times relevant hereto, PRN was and is controlled through Ammon Bundy's operations in Emmett, Idaho. Defendants actively market and promote PRN with the objective of increasing the payments that members of PRN make to the entities Ammon Bundy and Diego Rodriguez control, including Dono Custos and Freedom Tabernacle.

28.     Defendant Lisa M. Bundy is Ammon Bundy's wife and lives in Emmett, Gem County, Idaho. Lisa Bundy was not a defendant in the 2022 Bundy Lawsuit.

29.     White Barn Enterprises LLC ("White Barn") is an Idaho limited liability company. Its principal place of business is in Gem County, Idaho. White Barn was not a defendant in the 2022 Bundy Lawsuit.

30.     This Court has subject matter jurisdiction over this matter under Idaho Code § 1-705.

31.     The Bundys are subject to the personal jurisdiction of the courts of the State of Idaho because they are Idaho residents. In addition, they previously owned, and presently have possession of, the Idaho real properties and assets that are the subject of this action.

32.     White Barn is subject to the personal jurisdiction of the courts of the State of Idaho under Idaho Code § 5-514(a) and (c). White Barn transacts business in the State of Idaho. White Barn owns the real property that is the subject of this action.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 7**

33.     Venue is appropriate in Gem County under Idaho Code § 5-401 because this is an action for the determination of rights and interests in real property that is in Gem County.

## III.     GENERAL ALLEGATIONS

34.     The factual allegations set out in the Fourth Amended Complaint in the 2022 Bundy Lawsuit are established as true pursuant to a Court Order dated June 30, 2023.  The Fourth Amended Complaint [Redacted] is attached as **Exhibit B** and is incorporated hereto.

35.     The St. Luke's Parties are creditors of Ammon Bundy. As determined in the 2022 Bundy Lawsuit, Ammon Bundy committed various tortious acts against the St. Luke's Parties from March of 2022 through the present.

36.     As of the date of this Complaint, the St. Luke's Parties have not recovered any of the $52,498,000 in damages owed by Ammon Bundy, the Bundy Campaign, and PRN pursuant to the jury verdict in the 2022 Bundy Lawsuit.

## IV.     PLAINTIFFS' ALLEGATIONS REGARDING THE REAL PROPERTY

37.     At all times relevant hereto, including the date of this Complaint, the Bundys have lived in the Gem County residential property located at 4615 Harvest Lane, Emmett, Idaho described at **Exhibit C** attached hereto (the "Harvest Lane Property"). The Harvest Lane Property is a five-acre parcel improved by a 4,760-square-foot residence.

38.     Ammon Bundy and his spouse took title to the Harvest Lane Property in June 2015. Upon information and belief, the Harvest Lane Property was the community property of Ammon Bundy and Lisa Bundy as husband and wife.

39.     The Harvest Lane Property has a market value estimated to be between $1,000,000 to $1,500,000. The Gem County Assessor has most recently assessed the value of the

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 8**

Real Property at $1,033,978. Ammon Bundy owns or controls, through various entities, other real property estimated to have a collective market value in excess of $5,000,000.

40.     The 2022 Bundy Lawsuit Plaintiffs served their summons and complaint in the 2022 Bundy Lawsuit on Ammon Bundy on May 12, 2022. The 2022 Bundy Lawsuit Plaintiffs subsequently filed an amended complaint on June 2, 2022. Ammon Bundy was thereafter served with the amended complaint.

41.     Ammon Bundy never appeared in the 2022 Bundy Lawsuit. He never answered the complaint. He never answered the amended complaint. He never answered discovery issued to him. He did not appear for a deposition, in violation of notices and a court order that compelled his attendance. He never appeared before the district court judge. Nonetheless, the St. Luke's Parties served Ammon Bundy with every paper filed or entered in the 2022 Bundy Lawsuit.

42.     A default in accordance with Idaho Rule of Civil Procedure 55(a)(1) was entered against Ammon Bundy in the 2022 Bundy Lawsuit on September 2, 2022.

43.     The district court in the 2022 Bundy Lawsuit entered an order on October 12, 2022 awarding the Ada County Plaintiffs sanctions against Ammon Bundy in the amount of $5,325.53 in respect of his violation of duties in connection with discovery. The St. Luke's Parties recorded the sanctions order (the "Sanctions Order") against the Harvest Lane Property on November 10, 2022, creating a lien thereon (the "Sanctions Lien").

44.     The district court in the 2022 Bundy Lawsuit set a jury trial to determine the amount of damages, if any, owed by Ammon Bundy and the other Defendants to the St. Luke's Parties. The district court's order entered on October 17, 2022, set a ten-day jury trial to commence on July 10, 2023.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 9**

45.     The district court in the 2022 Bundy Lawsuit issued a writ of execution to the Sheriff of Gem County on November 3, 2022, directing him to collect sums owing by Ammon Bundy in respect of the Sanctions Order. The Sheriff's civil division served the writ on Lisa M. Bundy at the Real Property on November 18, 2022. The Sheriff's civil division's efforts to collect the sums owing was unsuccessful.

46.     On or about November 2022, Ammon Bundy entered into a scheme to frustrate the St. Luke's Parties' ability to recover against the Harvest Lane Property.  In furtherance of his scheme, Ammon Bundy engaged his longtime friend Aaron Welling ("Welling"), who had also served as the treasurer for Ammon Bundy's Idaho gubernatorial campaign, to engage in a sham transaction to transfer title of the Harvest Lane Property to White Barn, which is, in turn, owned by a limited liability company of which Welling and his spouse are the sole owners.

47.     The Bundys transferred title of the Harvest Lane Property to White Barn on or about December 5, 2022 (the "Transfer"). As part of the sham transaction, White Barn sent the Bundys $250,000, less than one-quarter of the Harvest Lane Property's market value. Ammon Bundy used the $250,000 from White Barn to pay off all debt that Ammon Bundy owed on the Harvest Lane Property.

48.     As a next step in the sham transaction, White Barn took out a promissory note for $250,000 with a bank ("White Barn Note") against the Harvest Lane Property; the White Barn Note returned to White Barn the amount previously transferred to the Bundys for the Harvest Lane Property.

49.     Then, White Barn entered a "lease" with Lisa M. Bundy ("Bundy Lease") for a five-year term with a monthly payment of $2,620, an amount far below the market rental rate for a residential property with a market value in excess of $1 million. The $2,620 monthly "rent"

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 10**

fully services the monthly debt on the White Barn Note. As a result of the White Barn Note and the Bundy Lease, White Barn, in effect, paid nothing to obtain title to the Harvest Lane Property.

50.     As part of the sham transaction, Ammon Bundy and his family never left the Harvest Lane Property, remained in uninterrupted possession of the property despite the title transfer. Further, the Bundys are now in a situation in which they are paying less than market value in rent.

51.     The Bundy Lease is between Lisa M. Bundy and White Barn and ostensibly gives the Bundys the right to continued possession of the Harvest Lane Property for five years. Lisa M. Bundy is accordingly the subsequent transferee of the Harvest Lane Property who did not take the property in good faith.

52.     In order to provide clear title to White Barn in connection with the Transfer, Bundy and his spouse were obligated to pay off the Sanctions Lien at closing. The closing agent accordingly paid the St. Luke's Parties from the Transfer proceeds.

53.     The Bundys never quit possession of the Harvest Lane Property. They continued residing at the Harvest Lane Property notwithstanding the Transfer.

54.     At the time that Ammon Bundy and his spouse made the Transfer, they enjoyed more than $750,000 in equity in the Real Property. The Transfer proceeds of $250,000 were sufficient to satisfy in full all creditors who held security interests or liens against the Real Property.

55.     White Barn did not take in good faith given that it paid only one-quarter of the value of the Harvest Lane Property and the Transfer was characterized by numerous badges of fraud as codified at Idaho Code § 55-913(2).

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 11**

56.     In addition to the sham transaction involving the Harvest Lane Property, Ammon Bundy, on information and belief, has engaged in other sham transactions and fraudulent conveyances to frustrate the St. Luke's Parties ability to collect judgment against Ammon Bundy, Bundy Campaign, and PRN.

57.     As referenced in his video posts and other public statements, Ammon Bundy has transferred, conveyed, or otherwise engaged in transactions of personal property, financial assets, corporate assets, contract rights, cryptocurrency, and real property for the purpose of hindering the St. Luke's Parties from collecting their judgments against Ammon Bundy, Bundy Campaign, and PRN.

58.     According to Ammon Bundy's own statements made both in public videos and public written statements, the Bundys have transferred or conveyed all of their assets with the exception of approximately $50,000 to avoid Plaintiffs having anything to access to compensate Plaintiffs for the substantial damages established in the 2022 Bundy Lawsuit.

59.     The Bundys transferred or conveyed these assets, after the St. Luke's Parties' claims arose, with the actual intent to hinder, delay, or defraud their creditors, specifically including the St. Luke's Parties.

60.      The Bundys made the Transfer of the Harvest Lane Property without receiving reasonably equivalent value in exchange for the transfer or obligation.

61.     Upon information and belief, the Bundys transferred, conveyed, or concealed additional substantial assets, after the St. Luke's Parties' claims arose, without receiving reasonably equivalent value in exchange for the transfers or obligations.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 12**

62.     The Bundys engaged in or are about to engage in business or transaction(s) for which the remaining assets of the Bundys were or are unreasonably small in relation to the business or transaction(s).

63.     The Bundys intended to incur, or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they came due.

64.     On information and belief, since the filing of the 2022 Bundy Lawsuit, Ammon Bundy has transferred and hidden assets or directed others to transfer and hide assets of the Bundy Campaign and PRN to hinder or frustrate efforts by the St. Luke's Parties to collect damages.

65.     These wrongful transactions include, but are not limited to, Ammon Bundy's transfer of and use of monies from the Bundy Campaign to benefit himself, businesses entities that he owns or controls, Diego Rodriguez, and business entities that are owned or controlled by Diego Rodriguez.

66.     On information and belief, Ammon Bundy has transferred, conveyed, hidden or concealed assets of PRN and has redirected donations to PRN to hinder or frustrate the St. Luke's Parties' efforts to collect damages.

## V.     COUNT ONE – A FRAUDULENT TRANSFER MADE WITH ACTUAL INTENT TO DEFRAUD UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT
### (Ammon Bundy, Lisa Bundy, White Barn)

67.     The St. Luke's Parties hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-66.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 13**

68.     The Bundys and White Barn made the Transfer of the Harvest Lane Property to White Barn with actual intent to hinder, delay, or defraud the St. Luke's Parties within the meaning of Idaho Code § 55-913(1)(a).

69.     As a result of the Sanctions Lien, Ammon Bundy understood that the liabilities that he incurred in respect to the Ada County Lawsuit would attach to the Harvest Lane Property. Accordingly, Ammon Bundy and his spouse Lisa M. Bundy made the Transfer to hinder, delay and defraud the St. Luke's Parties, from executing on the Harvest Lane Property in respect of any additional sanctions awards or judgment entered in their favor in the 2022 Bundy Lawsuit

70.     The Bundy's Transfer to White Barn was a transfer to an "insider" as used in, and defined in, Idaho Code §§ 55-913(2)(a) and 55-910(7). White Barn is an insider because Ammon Bundy's long-time "good friend[]," fellow church member, and political confidant Aaron Welling is the manager of White Barn and is an indirect owner of a beneficial interest in White Barn.

71.     The Bundys retained possession and control of the Harvest Lane Property after the Transfer.

72.     Before the Bundys made the Transfer, the St. Luke's Parties had sued Ammon Bundy.

73.     The value of the consideration received by the Bundys in respect of the Transfer was only about one-quarter of the value of the Harvest Lane Property.

74.     The Bundys made the Transfer after Ammon Bundy, the Bundy Campaign, and PRN committed the intentional torts that gave rise to their liability and shortly before a jury issued its verdict against Ammon Bundy, the Bundy Campaign, and PRN in favor of the St. Luke's Parties in the 2022 Bundy Lawsuit.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 14**

75.     On information and belief, in addition to the Harvest Lane Property, the Bundys transferred other assets after Ammon Bundy, the Bundy Campaign, and PRN committed the intentional torts that gave rise to their liability and shortly before a jury issued its verdict against Ammon Bundy, the Bundy Campaign, and PRN in favor of the St. Luke's Parties in the 2022 Bundy Lawsuit.

76.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties have been damaged in an amount exceeding $1,000,000.

77.     As a result of the actions of Bundy and White Barn, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

## VI.     COUNT TWO – A CONSTRUCTIVELY FRAUDULENT TRANSFER UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT (Ammon Bundy, Lisa Bundy, White Barn)

78.     Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-77.

79.     The Bundys and White Barn made the Transfer of the Harvest Lane Property without the Bundys receiving a reasonably equivalent value in exchange within the meaning of Idaho Code § 55-913(b).

80.     At the time of the Transfer of the Harvest Lane Property, the Bundys and White Barn believed or reasonably should have believed that the marital community would incur debts beyond their ability to pay as they came due within the meaning of Idaho Code § 55-913(b)(2).

81.     On information and belief, in addition to the Harvest Lane Property, the Bundys transferred other assets after Ammon Bundy, the Bundy Campaign, and PRN committed the intentional torts that gave rise to their liability and shortly before a jury issued its verdict against

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 15**

Ammon Bundy, the Bundy Campaign, and PRN in favor of the St. Luke's Parties in the 2022 Bundy Lawsuit.

82.     In addition to the Harvest Lane Property, the Bundys transferred other assets without receiving a reasonably equivalent value in exchange within the meaning of Idaho Code § 55-913(b).

83.     At the time of the transfer of other assets, the Bundys and White Barn believed or reasonably should have believed that the marital community would incur debts beyond their ability to pay as they came due within the meaning of Idaho Code § 55-913(b)(2).

84.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties have been damaged in an amount exceeding $1,000,000.

85.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

## VII.    COUNT THREE – A CONSTRUCTIVELY FRAUDULENT TRANSFER UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT (Ammon Bundy, Lisa Bundy, White Barn)

86.     Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-85.

87.     The Bundys transferred the Harvest Lane Property and other assets without receiving a reasonably equivalent value within the meaning of Idaho Code § 55-914.

88.     As of the date of these transfers, Ammon Bundy was insolvent, or became insolvent as a result of the transfers within the meaning of Idaho Code § 55-914(1).

89.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties have been damaged in an amount exceeding $1,000,000.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 16**

90.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

## VIII.     COUNT FOUR – A FRAUDULENT CONVEYANCE OF LAND
### (Ammon Bundy, Lisa Bundy, White Barn)

91.     Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-90.

92.     The warranty deed pursuant to which the Bundys transferred the Real Property to White Barn was made by the Bundys with intent to defraud subsequent encumbrancers thereon; namely, Plaintiffs. The instrument is void pursuant to Idaho Code § 55-901.

93.     White Barn was privy to the Bundys' fraud because of, among other things, the badges of fraud identified at ¶¶ 35-40 of this Complaint.

94.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties have been damaged in an amount exceeding $1,000,000.

95.     As a result of the actions of the Bundys and White Barn, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

## IX.     COUNT FIVE – A TRANSFER IN FRAUD OF CREDITORS
### (Ammon Bundy, Lisa Bundy, White Barn)

96.     Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-95.

97.     The Bundys and White Barn made the Transfer of the Harvest Lane Property with intent to delay and defraud Ammon Bundy's creditors. The transfer is void against all of Ammon Bundy's creditors pursuant to Idaho Code § 55-906.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 17**

98.      In addition to the Transfer of the Harvest Lane Property, the Bundys transferred

assets with intent to delay and defraud Ammon Bundy's creditors. These transfers are void

against all of Ammon Bundy's creditors pursuant to Idaho Code § 55-906.

99.      As a result of these actions, the St. Luke's Parties have been damaged in an

amount exceeding $1,000,000.

100.     As a result of the actions of Bundy and White Barn, the St. Luke's Parties are

entitled to all appropriate damages and remedies, including those available pursuant to Idaho

Code § 55-917.

## X.   COUNT SIX – A FRAUDULENT TRANSFER MADE WITH ACTUAL INTENT TO DEFRAUD UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT
### (Ammon Bundy, Bundy Campaign, and PRN)

101.     The St. Luke's Parties hereby reallege and incorporate in full the allegations set

forth above in ¶¶ 1-100.

102.     Ammon Bundy, the Bundy Campaign, and PRN have been aware of the 2022

Bundy Lawsuit since May of 2022.  As a result, they understood that their assets would be

subject to collection to satisfy any damages verdict against them in the 2022 Bundy Lawsuit.

103.     On information and belief, Ammon Bundy, the Bundy Campaign, and PRN

transferred and conveyed assets with actual intent to hinder, delay, or defraud the St. Luke's

Parties within the meaning of Idaho Code § 55-913(1)(a).

104.     Ammon Bundy, the Bundy Campaign, and PRN made the fraudulent transfers

after Ammon Bundy, the Bundy Campaign, and PRN committed the intentional torts that gave

rise to their liability and shortly before a jury issued its verdict against Ammon Bundy, the

Bundy Campaign, and PRN in favor of the St. Luke's Parties in the 2022 Bundy Lawsuit.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 18**

105.    As a result of the actions of Ammon Bundy, the Bundy Campaign, and White Barn,  the St. Luke's Parties have been damaged in an amount to be proven at trial but exceeding $1,000,000.

106.    As a result of the actions of Ammon Bundy, the Bundy Campaign, and White Barn, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

## XI.    COUNT SEVEN – A CONSTRUCTIVELY FRAUDULENT TRANSFER UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT (Ammon Bundy, Bundy Campaign, and PRN)

107.    Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-106.

108.    Upon information and belief Ammon Bundy, the Bundy Campaign, and PRN transferred assets after Ammon Bundy, the Bundy Campaign, and PRN committed the intentional torts that gave rise to their liability and shortly before a jury issued its verdict against Ammon Bundy, the Bundy Campaign, and PRN in favor of the St. Luke's Parties in the 2022 Bundy Lawsuit.

109.    Upon information and belief Ammon Bundy, the Bundy Campaign, and PRN transferred assets without receiving a reasonably equivalent value in exchange within the meaning of Idaho Code § 55-913(b).

110.    At the time of the transfer, Ammon Bundy, the Bundy Campaign, and PRN believed or reasonably should have believed that the marital community would incur debts beyond their ability to pay as they came due within the meaning of Idaho Code § 55-913(b)(2).

111.    As a result of the actions of Ammon Bundy, the Bundy Campaign, and PRN, the St. Luke's Parties have been damaged in an amount exceeding $100,000,000.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 19**

112.     As a result of the actions of Ammon Bundy, the Bundy Campaign, and PRN, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

**XII.     COUNT EIGHT– A CONSTRUCTIVELY FRAUDULENT TRANSFER UNDER THE IDAHO UNIFORM FRAUDULENT TRANSFER ACT**
**(Ammon Bundy, Bundy Campaign, and PRN)**

113.     Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-112.

114.     Ammon Bundy, the Bundy Campaign, and PRN transferred assets without receiving a reasonably equivalent value within the meaning of Idaho Code § 55-914.

115.     As of the date of these transfers, Ammon Bundy was insolvent, or became insolvent as a result of the transfers within the meaning of Idaho Code § 55-914(1).

116.     As a result of the actions of Ammon Bundy, the Bundy Campaign, and PRN, the St. Luke's Parties have been damaged in an amount exceeding $1,000,000.

117.     As a result of the actions of Ammon Bundy, the Bundy Campaign, and PRN, the St. Luke's Parties are entitled to all appropriate damages and remedies, including those available pursuant to Idaho Code § 55-917.

**XIII.     COUNT NINE – DECLARATORY RELIEF**

118.      Plaintiffs hereby reallege and incorporate in full the allegations set forth above in ¶¶ 1-117.

119.     An actual case and controversy exists between the parties and may be adjudicated by this court pursuant to Idaho Code § 10-1201 *et seq*.

120.     Plaintiffs seek the following declarations from the Court:

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 20**

a.      The Transfer of the White Barn Property was fraudulent and is therefor void against all of Ammon Bundy's creditors as a matter of law;

b.      Any and all other transfers or conveyances within the scope of the Idaho Uniform Fraudulent Transfer Act made after the 2022 Bundy Lawsuit commenced are void as a matter of law;

c.      St. Luke's Parties have the right to collect the damages found in the 2022 Bundy Lawsuit and therefor:

   i.      Defendants are enjoined from making any transfers, sales, or conveyances of the real property located at 4615 Harvest Ln., Emmett, ID 83617 (the "Real Property");

   ii.     Defendants are enjoined from selling, transferring, or conveying any other real property to which they have any claim of title or ownership;

   iii.    Defendants are enjoined from transferring any ownership interests they hold in any entity, including but not limited to People's Rights Network, Ammon Bundy for Governor, and Abish-husbondi Inc.; and

   iv.    Defendants are enjoined from transferring monetary assets from any institution or bank where the assets are held as of the date of this Order, including any assets held at Clarity Credit Union in Emmett, Idaho.

**PRAYER FOR RELIEF**

Plaintiffs St. Luke's Health System, Ltd. and St. Luke's Regional Medical Center, Ltd., Chris Roth, Dr. Natasha D. Erickson, and Tracy W. Jungman, NP pray that this Court enter the following relief in their favor against the above-named Defendants:

A.      Avoidance of the Transfer and any subsequent transfers, including the Lease, to restore ownership of the Real Property to Ammon Bundy and Lisa M. Bundy free and clear of the Lease but subject to any judgment obtained by Plaintiffs in the 2022 Bundy Lawsuit.

B.      Defendants are enjoined from transferring, hiding, or conveying any assets, including real property, to hinder or frustrate efforts by the St. Luke's Parties to collect damages.

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND DECLARATORY RELIEF - 21**

C.      Avoidance of the transfer by Defendants of any ownership interests they hold in any entity, including but not limited to People's Rights Network, Ammon Bundy for Governor, and Abish-husbondi Inc., but subject to any judgment obtained by Plaintiffs in the 2022 Bundy Lawsuit.

D.      Avoidance from the transfer by Defendants of monetary assets from any institution or bank where the assets are held, including any assets held at Clarity Credit Union in Emmett, Idaho, until satisfaction of the debts Defendants Ammon Bundy, Ammon Bundy for Governor, and People's Rights Network owe Plaintiffs, but subject to any judgment obtained by Plaintiffs in the 2022 Bundy Lawsuit.

E.      A money judgment against White Barn Enterprises LLC, the transferee of the Transfer, for the value of the Real Property under Idaho Code § 55-917(2)(a).

F.      A money judgment against Lisa M. Bundy as the subsequent transferee of White Barn Enterprises LLC under Idaho Code § 55-917(2)(b).

G.      A money judgment against each of the Defendants, jointly and severally, in the amount of the costs incurred by Plaintiffs.

H.      That the Court award such other and further relief as is right and just.

DATED this 11th day of August, 2023.

HOLLAND & HART LLP

By:   ___/s/ Erik F. Stidham_____
        Erik F. Stidham
        Robert A. Faucher
        Anne E. Henderson
        Attorneys for Plaintiffs

30291067_v1

**COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFERS AND
DECLARATORY RELIEF - 22**

# EXHIBIT A



## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

Filed: 07/25/2023 13:05:08
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Nelson, Ric

ST. LUKE'S HEALTH SYSTEM, LTD; ST.
LUKE'S REGIONAL MEDICAL CENTER,
LTD; CHRIS ROTH, an individual;
NATASHA D. ERICKSON, MD, an
individual; and TRACY W. JUNGMAN, NP,
an individual,

      Plaintiffs,

vs.

AMMON BUNDY, an individual; AMMON
BUNDY FOR GOVERNOR, a political
organization; DIEGO RODRIGUEZ, an
individual; FREEDOM MAN PRESS LLC, a
limited liability company; FREEDOM MAN
PAC, a registered political action committee;
and PEOPLE'S RIGHTS NETWORK, a
political organization and an unincorporated
association,

      Defendants.

Case No. CV01-22-06789

**SPECIAL VERDICT FORM**

We, the jury, answer the special verdict questions as set forth below.

**To reach a verdict on a question, at least nine of the twelve jury members must**

**agree.**

      **Question No. 1**: **Defamation**. It has been established that Defendants Ammon Bundy,
the People's Rights Network, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man
Press LLC, and Freedom Man PAC each made defamatory statements about each of the
Plaintiffs: St. Luke's, Chris Roth, Natasha Erickson, and Tracy Jungman. Please indicate the
amount of compensatory damages, if any, you find were proximately caused by each Defendant
as to each Plaintiff.

SPECIAL VERDICT FORM - 1

**a.**     **Defendant Ammon Bundy caused compensatory damages in the amount of:**

    i.      To Plaintiff St. Luke's: $ 3,500,000. [Number of Jurors that agree 10]

    ii.     To Plaintiff Chris Roth: $ 125,000. [Number of Jurors that agree 11 ]

    iii.    To Plaintiff Natasha Erickson: $ 450,000. [Number of Jurors that agree 11 ]

    iv.     To Plaintiff Tracy Jungman: $225,000. [Number of Jurors that agree 11]

**b.**     **Defendant People's Rights Network caused compensatory damages in the amount of:**

    i.      To Plaintiff St. Luke's: $2,800,000. [Number of Jurors that agree 10]

    ii.     To Plaintiff Chris Roth: $ 100,000. [Number of Jurors that agree 11]

    iii.    To Plaintiff Natasha Erickson: $ 300,000.[Number of Jurors that agree 11]

    iv.     To Plaintiff Tracy Jungman: $ 300,000 [Number of Jurors that agree 11]

**c.**     **Defendant Ammon Bundy for Governor caused compensatory damages in the amount of:**

    i.      To Plaintiff St. Luke's: $ 700,000. [Number of Jurors that agree 11 ]

    ii.     To Plaintiff Chris Roth: $ 25,000. [Number of Jurors that agree 11]

    iii.    To Plaintiff Natasha Erickson: $ 150,000.[Number of Jurors that agree 11]

    iv.     To Plaintiff Tracy Jungman: $ 75,000. [Number of Jurors that agree 11]

**d.**     **Defendant Diego Rodriguez caused compensatory damages in the amount of:**

    i.      To Plaintiff St. Luke's: $3,500,000. [Number of Jurors that agree 11]

    ii.     To Plaintiff Chris Roth: $ 125,000. [Number of Jurors that agree 11]

    iii.    To Plaintiff Natasha Erickson: $ 225,000. [Number of Jurors that agree 11 ]

    iv.     To Plaintiff Tracy Jungman: $ 525,000.[Number of Jurors that agree 11]

SPECIAL VERDICT FORM - 2

e.   **Defendant Freedom Man Press LLC caused compensatory damages in the amount of:**

    i.    To Plaintiff St. Luke's: $2,800,000. [Number of Jurors that agree 11 ]

    ii.    To Plaintiff Chris Roth: $ 100,000. [Number of Jurors that agree 11 ]

    iii.    To Plaintiff Natasha Erickson: $ 300,000. [Number of Jurors that agree 11 ]

    iv.    To Plaintiff Tracy Jungman: $ 300,000. [Number of Jurors that agree 11 ]

f.   **Defendant Freedom Man PAC caused compensatory damages in the amount of:**

    i.    To Plaintiff St. Luke's: $ 700,000 [Number of Jurors that agree 11 ]

    ii.    To Plaintiff Chris Roth: $ 25,000. [Number of Jurors that agree 11 ]

    iii.    To Plaintiff Natasha Erickson: $ 75,000. [Number of Jurors that agree 11 ]

    iv.    To Plaintiff Tracy Jungman: $ 75,000. [Number of Jurors that agree 11 ]

**Question No. 2**: Invasion of Privacy/False Light. It has been established that Defendants Ammon Bundy, the People's Rights Network, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, and Freedom Man PAC each placed Chris Roth, Natasha Erickson, and Tracy Jungman in a false light in the public eye by publicly disclosing some falsity or fiction concerning Chris Roth, Natasha Erickson, and Tracy Jungman. Please indicate the amount of compensatory damages, if any, you find were proximately caused by each Defendant as to each Plaintiff below.

a.   **Defendant Ammon Bundy caused compensatory damages in the amount of:**

    i.    To Plaintiff Chris Roth: $ 187,500. [Number of Jurors that agree 11 ]

    ii.    To Plaintiff Natasha Erickson: $ 750,000. [Number of Jurors that agree 11 ]

    iii.    To Plaintiff Tracy Jungman: $ 375,000. [Number of Jurors that agree 11 ]

b.   **Defendant People's Rights Network caused compensatory damages in the amount of:**

    i.    To Plaintiff Chris Roth: $ 150,000. [Number of Jurors that agree 11 ]

    ii.    To Plaintiff Natasha Erickson: $ 500,000 [Number of Jurors that agree 11 ]

**Exhibit D, Page 26**

iii.    To Plaintiff Tracy Jungman: $ 500,000. [Number of Jurors that agree |/]

**c.    Defendant Ammon Bundy for Governor caused compensatory damages in the amount of:**

i.    To Plaintiff Chris Roth: $ 37,500.   [Number of Jurors that agree ||]

ii.    To Plaintiff Natasha Erickson: $ 250,000. [Number of Jurors that agree ||]

iii.    To Plaintiff Tracy Jungman: $ 125,000.[Number of Jurors that agree ||]

**d.    Defendant Diego Rodriguez caused compensatory damages in the amount of:**

i.    To Plaintiff Chris Roth: $ 187,500.   [Number of Jurors that agree |/]

ii.    To Plaintiff Natasha Erickson: $ 375,000.[Number of Jurors that agree ||]

iii.    To Plaintiff Tracy Jungman: $ 875,000. [Number of Jurors that agree |/]

**e.    Defendant Freedom Man Press LLC caused compensatory damages in the amount of:**

i.    To Plaintiff Chris Roth: $ 150,000.   [Number of Jurors that agree ||]

ii.    To Plaintiff Natasha Erickson: $ 500,000.  Number of Jurors that agree |||

iii.    To Plaintiff Tracy Jungman: $ 500,000. [Number of Jurors that agree ||]

**f.    Defendant Freedom Man PAC caused compensatory damages in the amount of:**

i.    To Plaintiff Chris Roth: $ 37,500.    [Number of Jurors that agree |]

ii.    To Plaintiff Natasha Erickson: $ 125,000. [Number of Jurors that agree ||]

iii.    To Plaintiff Tracy Jungman: $ 125,000.  [Number of Jurors that agree |/]

SPECIAL VERDICT FORM - 4

**Question No. 3**: **Intentional Infliction of Emotional Distress**. It has been established that Defendants Ammon Bundy, the People's Rights Network, Ammon Bundy for Governor, Diego Rodriguez, Freedom Man Press LLC, and Freedom Man PAC each engaged in intentional infliction of emotional distress against Chris Roth, Natasha Erickson, and Tracy Jungman. Please indicate the amount of compensatory damages, if any, you find were proximately caused by each Defendant as to each Plaintiff below.

**a.**   **Defendant Ammon Bundy caused compensatory damages in the amount of:**

   i.   To Plaintiff Chris Roth: $ 187,500.   [Number of Jurors that agree 11]

   ii.   To Plaintiff Natasha Erickson: $ 300,000. [Number of Jurors that agree 11]

   iii.   To Plaintiff Tracy Jungman: $ 150,000.   [Number of Jurors that agree 11]

**b.**   **Defendant People's Rights Network caused compensatory damages in the amount of:**

   i.   To Plaintiff Chris Roth: $ 150,000.   [Number of Jurors that agree 11]

   ii.   To Plaintiff Natasha Erickson: $ 200,000.   [Number of Jurors that agree 11]

   iii.   To Plaintiff Tracy Jungman: $ 200,000.   [Number of Jurors that agree 11]

**c.**   **Defendant Ammon Bundy for Governor caused compensatory damages in the amount of:**

   i.   To Plaintiff Chris Roth: $ 37,500.   [Number of Jurors that agree 11]

   ii.   To Plaintiff Natasha Erickson: $ 100,000. [Number of Jurors that agree 11]

   iii.   To Plaintiff Tracy Jungman: $ 50,000. [Number of Jurors that agree 11]

**d.**   **Defendant Diego Rodriguez caused compensatory damages in the amount of:**

   i.   To Plaintiff Chris Roth: $ 187,500. [Number of Jurors that agree 11]

   ii.   To Plaintiff Natasha Erickson: $ 150,000. [Number of Jurors that agree 11]

   iii.   To Plaintiff Tracy Jungman: $ 350,000. [Number of Jurors that agree 11]

**e.** **Defendant Freedom Man Press LLC caused compensatory damages in the amount of:**

    i.    To Plaintiff Chris Roth: $ _150,000._ [Number of Jurors that agree _11_ ]

    ii.    To Plaintiff Natasha Erickson: $ _200,000._ [Number of Jurors that agree _11_ ]

    iii.    To Plaintiff Tracy Jungman: $ _200,000._ [Number of Jurors that agree _11_ ]

**f.** **Defendant Freedom Man PAC caused compensatory damages in the amount of:**

    i.    To Plaintiff Chris Roth: $ _37,500._ [Number of Jurors that agree _11_ ]

    ii.    To Plaintiff Natasha Erickson: $ _50,000._ [Number of Jurors that agree _11_ ]

    iii.    To Plaintiff Tracy Jungman: $ _50,000._ [Number of Jurors that agree _11_ ]

**Question 4: Trespass (Boise).** It has been established that Defendants Ammon Bundy and Diego Rodriguez trespassed on the property of St. Luke's *Boise*. Please indicate the amount of compensatory damages, if any, you find were proximately caused by Defendants Bundy and Rodriguez below.

**a.** **Defendant Ammon Bundy caused compensatory damages in the amount of:**

    i.    To St. Luke's: $ _0_ [Number of Jurors that agree _9_ ]

**b.** **Defendant Diego Rodriguez caused compensatory damages in the amount of:**

    i.    To St. Luke's: $ _0_ [Number of Jurors that agree _9_ ]

**Question 5: Trespass (Meridian).** It has been established that Defendant Ammon Bundy trespassed on the property of St. Luke's Meridian. Please indicate the amount of compensatory damages, if any, you find were proximately caused by Defendant Bundy.

**a.** **Defendant Ammon Bundy caused compensatory damages in the amount of:**

    i. To St. Luke's: $ _0_ [Number of Jurors that agree _9_ ]

**Exhibit D, Page 29**

**Question 6: Idaho Charitable Solicitation Act (Part 1).** It has been established that Defendants Diego Rodriguez and Freedom Man Press LLC violated the Idaho Charitable Solicitation Act. Do you find that Plaintiffs suffered injury or harm as a result of the violation?

a.   **Defendant Diego Rodriguez's violation caused injury or harm to:**

|      |                   |          |                                                     |
|------|-------------------|----------|-----------------------------------------------------|
| i.   | St. Luke's        | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| ii.  | Chris Roth        | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| iii. | Natasha Erickson  | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| iv.  | Tracy Jungman     | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |

b.   **Defendant Freedom Man Press LLC's violation caused injury or harm to:**

|      |                   |          |                                                     |
|------|-------------------|----------|-----------------------------------------------------|
| i.   | St. Luke's        | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| ii.  | Chris Roth        | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| iii. | Natasha Erickson  | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |
| iv.  | Tracy Jungman     | [✓] Yes  | [ ] No  [Number of Jurors that agree 12]            |

**If you answered "Yes" to Question 6, please answer Question 7 with respect to that Defendant. As to any Defendant to which you answered "No," skip Question 7.**

**Question 7: Idaho Charitable Solicitation Act (Part 2)**. Please state the amount wrongfully obtained by the Defendants violation of the Idaho Charitable Solicitation Act, if any.

a.   Defendant Diego Rodriguez: $250,000. [Number of Jurors that agree 11]

b.   Defendant Freedom Man Press LLC: $250,000. [Number of Jurors that agree 11]

**Question 8: Punitive Damages (Part 1)**. If you have awarded compensatory damages under Questions 1-5 and/or 7 above, please indicate the amount of punitive damages, if any, to be awarded to a Plaintiff against each Defendant. If you find a Defendant's conduct as to a Plaintiff was malicious, fraudulent, oppressive, or outrageous you may award punitive damages.

SPECIAL VERDICT FORM - 7

a.  **Defendant Ammon Bundy:**

    i.    St. Luke's    $ 1,250,000. [Number of Jurors that agree 9 ]
    ii.   Chris Roth    $ 1,750,000. [Number of Jurors that agree 9 ]

    iii.  Natasha Erickson    $ 2,100,000. [Number of Jurors that agree 9 ]

    iv.  Tracy Jungman    $ 1,050,000. [Number of Jurors that agree 9 ]

b.  **Defendant People's Rights Network:**

    i.    St. Luke's    $ 1,000,000. [Number of Jurors that agree 9 ]

    ii.   Chris Roth    $ 1,400,000. [Number of Jurors that agree 9 ]

    iii.  Natasha Erickson    $ 1,400,000. [Number of Jurors that agree 9 ]

    iv.  Tracy Jungman    $ 1,400,000. [Number of Jurors that agree 9 ]

c.  **Defendant Ammon Bundy for Governor:**

    i.    St. Luke's    $ 250,000. [Number of Jurors that agree 9 ]

    ii.   Chris Roth    $ 350,000. [Number of Jurors that agree 9 ]

    iii.  Natasha Erickson    $ 700,000. [Number of Jurors that agree 9 ]

    iv.  Tracy Jungman    $ 350,000. [Number of Jurors that agree 9 ]

d.  **Defendant Diego Rodriguez:**

    i.    St. Luke's    $ 1,250,000. [Number of Jurors that agree 9 ]

    ii.   Chris Roth    $ 1,750,000. [Number of Jurors that agree 9 ]

    iii.  Natasha Erickson    $ 1,050,000. [Number of Jurors that agree 9 ]

    iv.  Tracy Jungman    $ 2,450,000. [Number of Jurors that agree 9 ]

e.  **Defendant Freedom Man Press LLC:**

    i.    St. Luke's    $ 1,000,000. [Number of Jurors that agree 9 ]

SPECIAL VERDICT FORM - 8

**Exhibit D, Page 31**

    ii.    Chris Roth    $ 1,400,000. [Number of Jurors that agree 9]

    iii.    Natasha Erickson    $ 1,400,000. [Number of Jurors that agree 9]

    iv.    Tracy Jungman    $ 1,400,000. [Number of Jurors that agree 9]

**f.**    **Defendant Freedom Man PAC:**

    i.    St. Luke's    $ 250,000. [Number of Jurors that agree 9]

    ii.    Chris Roth    $ 350,000. [Number of Jurors that agree 9]

    iii.    Natasha Erickson    $ 350,000. [Number of Jurors that agree 9]

    iv.    Tracy Jungman    $ 350,000. [Number of Jurors that agree 9]

    **Question 9: Punitive Damages (Part 2)**. Did the conduct underlying each claim for which you awarded compensatory damages independently support the amount of punitive damages?

    a.  Ammon Bundy    [✓] Yes [ ] No    [Number of Jurors that agree 12]

    b.  People's Rights Network    [✓] Yes [ ] No    [Number of Jurors that agree 12]

    c.  Ammon Bundy for Governor  [✓] Yes [ ] No    [Number of Jurors that agree 12]

    d.  Diego Rodriguez    [✓] Yes [ ] No    [Number of Jurors that agree 12]

    e.  Freedom Man Press LLC    [✓] Yes [ ] No    [Number of Jurors that agree 12]

    f.  Freedom Man PAC    [✓] Yes [ ] No    [Number of Jurors that agree 12]

**If you answered "Yes" as to all Defendants in Question 9, please skip Question 10. If you answered "No" as to any Defendant in Question 9, please proceed to Question 10.**

**Question 10: Punitive Damages (Part 3)**. As to any Defendant for which you answered "No" for Question 9, please write down the Count(s) and the corresponding Plaintiff(s) for which the conduct does <u>NOT</u> support your punitive damages award:

a.   Ammon Bundy:

Count(s)                                Plaintiff(s)

_____        _____

_____        _____

_____        _____

_____        _____

b.   People's Rights Network:

Count(s)                                Plaintiff(s)

_____        _____

_____        _____

_____        _____

_____        _____

c.   Ammon Bundy for Governor:

Count(s)                                Plaintiff(s)

_____        _____

_____        _____

_____        _____

_____        _____

d.   Diego Rodriguez :

Count(s)                                Plaintiff(s)

_____        _____

_____        _____

_____        _____

_____        _____

e.   Freedom Man Press LLC:

| Count(s) | Plaintiff(s) |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

f.   Freedom Man PAC :

| Count(s) | Plaintiff(s) |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Once you have completed your answers to each of the questions, have your foreperson sign the verdict form and notify the Bailiff you have reached a verdict.**

**Dated:** 7/24/2023 _____    _____
                                        **Foreperson**

SPECIAL VERDICT FORM - 11

**Exhibit D, Page 34**

# EXHIBIT B

Electronically Filed
3/3/2023 10:59 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Erik F. Stidham (ISB #5483)
Jennifer M. Jensen (ISB #9275)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-5974
Telephone:  208.342.5000
Facsimile:  208.343.8869
E-mail:   efstidham@hollandhart.com
          jmjensen@hollandhart.com

*Counsel for Plaintiffs*

## IN THE DISTRICT COURT OF THE FOURTH  JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD; CHRIS ROTH, an individual; NATASHA D. ERICKSON, MD, an individual; and TRACY W. JUNGMAN, NP, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association,<br><br>Defendants. | Case No. CV01-22-06789<br><br>**FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**(REDACTED)** |

St. Luke's Health System, Ltd. ("SLHS"), St. Luke's Regional Medical Center, Ltd.

("SLRMC"), Chris Roth ("Mr. Roth"), Dr. Natasha D. Erickson  ("Dr. Erickson"), and Tracy W.

Jungman, NP ("NP Jungman"), collectively "St. Luke's Parties" or "Plaintiffs," by and through

**Exhibit D, Page 36**

their counsel, Holland & Hart, LLP, hereby bring this Complaint against Ammon Bundy ("Bundy"), Ammon Bundy for Governor ("Bundy Campaign"), Diego Rodriguez ("Rodriguez"), Freedom Man Press LLC ("FMP"), Freedom Man PAC ("FM PAC"), and the People's Rights Network ("PRN"), collectively "Defendants," and allege as follows:

## NATURE OF THE CASE

1.      Defendants engaged in a grift, recklessly exploiting ███████████████ of an Infant to gain money and publicity for themselves. Seeking to benefit financially, to enhance their standing among their followers, and to grow the membership of and revenues from PRN, Bundy (a former candidate for Governor and founder and leader of the activist People's Rights Network) and Rodriguez (an aspiring political and religious figure, acolyte of Bundy, and consultant and spokesperson for the Bundy Campaign) acted in concert with the other Defendants to launch a knowingly dishonest and smear campaign that claimed Idaho State employees, the judiciary, the police, primary care providers, and the St. Luke's Parties engaged in widespread kidnapping, trafficking, sexual abuse, and killing of Idaho children.

2.      In furtherance of their smear campaign, Defendants used slick marketing tactics and disinformation to launch a coordinated attack of defamation and organized business disruption against the St. Luke's Parties. Defendants incited and agitated their followers with false conspiracy theories of the kidnapping, trafficking, sexual abuse, and killing of children purposefully creating the risk that their followers would threaten or actually commit acts of violence against the St. Luke's Parties. Defendants made no effort to conceal their improper objectives. Indeed, they publicly declared that they wanted to subject the St. Luke's Parties to unrelenting public shaming that would cause reputational damage and humiliation of such intensity that SLHS and SLRMC would be run out of business and Mr. Roth, CEO of SLHS, Dr. Erickson, a St. Luke's pediatric physician, and NP Jungman, a St. Luke's nurse practitioner,

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 2

would lose their careers and be shunned by their friends, colleagues, neighbors, spouses, and children.

3.       As a premise for their wrongful actions, Defendants mischaracterized the Idaho Department of Health and Welfare's ("DHW") decision to intervene to ensure the health and safety of ███████████████████ Bundy, Rodriguez, and the other Defendants falsely claimed that DHW's intervention was wholly without basis and was an example of the widespread government conspiracy of kidnapping, trafficking, sexual abuse, and killing of children for financial gain.

4.       Defendants falsely stated that the St. Luke's Parties were participants in this nefarious organized ring and had participated in the kidnapping and mistreatment of the Infant. Among other things, Defendants falsely stated that (1) the St. Luke's Parties initiated and caused the State's intervention relating to the Infant, (2) the Infant had no need for medical care from the St. Luke's Parties, (3) the St. Luke's Parties provided unnecessary and improper medical treatment to drive up medical bills for the Infant's parents, (4) the St. Luke's Parties harmed the Infant, (5) the St. Luke's Parties had the authority to release the Infant but were illegally refusing to do so, and (6) that St. Luke's was conspiring with Idaho Governor Brad Little (Bundy's political opponent) in targeting the Infant.  The Defendants made these false statements and others relating to the St. Luke's Parties while knowing the statements to be without factual basis or recklessly disregarding the truth.

5.       Bundy and Rodriguez coordinated the wrongful attacks to further a number of improper objectives, including (1) to harm the St. Luke's Parties, (2) to subvert the authority and rulings of the judiciary through harassment, (3) to mislead and manipulate their followers, (4) to enhance their political reputations and personal brands, (5) to grow membership in the PRN,

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 3

(6) to drive traffic to Defendants' websites, (7) to benefit themselves financially through financial contributions, donations, and fees paid to the Bundy Campaign, Rodriguez's political action committee (FM PAC), the PRN, a supposed charity benefitting Rodriguez's family, Bundy's entities Dono Custos, Inc. and Abish-husbondi, Inc., and Rodriguez's entity Freedom Tabernacle Incorporated and Power Marketing Agency, LLC and Power Marketing Consultants LLC .

6.      The St. Luke's Parties bring this lawsuit to protect patients and staff from further harm, defamation, harassment, and threats of violence and to ensure that political bullying and Defendants' grift do not prevent St. Luke's from furthering its mission to improve the health of people in the communities it serves.

## PARTIES, VENUE, AND JURISDICTION

7.      At all times relevant hereto, Plaintiff SLHS was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho.

8.      At all times relevant hereto, Plaintiff SLRMC was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho.

9.      At all times relevant hereto, Plaintiff Mr. Roth was and is President and CEO of SLHS and a resident of Idaho.

10.      At all times relevant hereto, Plaintiff Dr. Erickson was and is a physician specializing in pediatric medicine.  She is an employee of SLRMC and a resident of Idaho.

11.      At all times relevant hereto, Plaintiff NP Jungman was and is a nurse practitioner specializing in pediatrics.  She is an employee of SLRMC and a resident of Idaho.

12.      At all times relevant hereto, Defendant Ammon Bundy was and is a resident of Idaho.  Bundy controls the Bundy Campaign and is the founder and leader of the PRN.  Through his control of the PRN, Bundy effectively controls PRN's website, peoplesrights.org. Bundy

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 4

generates money for his use and benefit by marketing himself as an anti-government, quasi-religious leader.

13.      Bundy owns and controls or owned and controlled at least two corporate entities (Dono Custos, Inc. and Abish-husbondi. Inc.) through which he generates revenues for himself from his campaign and leadership of PRN. Dono Custos receives money directly from members of PRN. Revenues received by Dono Custos are used to benefit Bundy. Abish-husbondi received payments directly from the Bundy Campaign and those payments benefited Bundy personally. The potential revenue to Bundy is significant. If each member of PRN annually contributes just $50 to Bundy through Dono Custos, Bundy could pocket more than $3,000,0000 per year. Bundy directed tens of thousands of dollars contributed to the Bundy Campaign to Abish-husbondi.

14.      On information and belief, the corporate personalities of Dono Custos and Abish-husbondi and Bundy are indistinguishable; Bundy exerts complete control over the entities and all decision making by the entities such that the entities operate as alter-egos of Bundy. On information and belief, Abish-husbondi and Dono Custos do not operate separately from Bundy, do not follow corporate formalities, and do not keep separate books.

15.      At all times relevant hereto, Defendant Bundy Campaign was and is an Idaho political organization formed for the ostensible purpose of raising money to support Bundy's effort to become Governor of Idaho.  Aaron Welling was the treasurer for the Bundy Campaign. Welling resigned in late spring 2022. After Welling's resignation, Bundy took over and became treasurer. Monies received by the Bundy Campaign were distributed to entities owned by Bundy and entities owned by Rodriguez.

16.      At all times relevant hereto, Defendant Rodriguez was a resident of Idaho. Rodriguez promotes himself as a world-renowned marketing consultant, motivational speaker,

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 5

religious leader, author, and political activist.  Rodriguez is a leader in the PRN, serves or served as a consultant to and spokesperson for the Bundy Campaign, controls the FMP and the FM PAC, and writes political attack columns for FMP under the alias "Gunner Steele." Rodriguez is financially entangled with the other Defendants and seeks to benefit from the false conspiracy he manufactured.  Rodriguez is the founder of Freedom Tabernacle Incorporated which purports to be a church but is used as an entity to receive contributions, dues, or payments from members of PRN. Also, Rodriguez is financially motivated to grow Freedom Tabernacle as he mandates members "tithe" 10% of their earnings. Rodriguez benefits from monies received by the Freedom Tabernacle and the growth of PRN. Rodriguez receives money from the Bundy Campaign through at least one of his business entities, Power Marketing. Rodriguez use his enhanced profile and the manufactured conspiracy relating to the Infant to sell three-day "training" courses through Power Marketing for which he charges $15,000 per "student."

17.     On information and belief, the corporate personalities of Freedom Tabernacle Incorporated, Power Marketing Agency, LLC, and Power Marketing Consultants, LLC are indistinguishable from Rodriguez; Rodriguez exerts complete control over the entities and all decision making by the entities such that the entities operate as alter-egos of Rodriguez. On information and belief, Freedom Tabernacle, Power Marketing Agency, and Power Marketing Consultants do not operate separately from Rodriguez, do not follow corporate formalities, and do not keep separate books. To the extent the corporate entities have other individuals involved, they are the family members controlled by Rodriguez. Freedom Tabernacle, Power Marketing Agency, and Power Marketing Consultants are alter-egos of Rodriguez.

18.     At all times relevant hereto, and based on information on freedomman.org, Defendant FMP held itself out as a limited liability company which owns and controls

freedomman.org, a website that specializes in political attacks and disinformation and advocates

for the harassment of political opponents through "doxing."  FMP is not registered as an LLC in

Idaho or registered to do business in Idaho.  FMP, its website, and all content on the FMP

website are controlled by Rodriguez.

19.      At all times relevant hereto, FM PAC is and was an Idaho registered political

action committee formed by and controlled by Rodriguez.  FM PAC works in coordination with

FMP and is promoted on freedomman.org.

20.      Founded and controlled by Bundy, Defendant PRN is an unincorporated

association of over 60,000 members. Like Bundy, PRN does not recognize the government's

authority over a person's "life, liberty, or justly acquired property"; rather, PRN operates based

on Bundy's teachings that PRN members are divinely ordained to adjudicate supposed violations

of "rights" and punish extrajudicially the "wicked" person, through harassment, doxing, or the

use of force. PRN owns and operates the peoplesrights.org website.  PRN markets itself as a

network designed to defeat "government criminals" who seek to take away rights and freedoms.

In truth, PRN is an unincorporated association controlled by Bundy which acts extra-judicially

and uses doxing, harassment, economic disruption, and threats of violence to harass political

enemies and to enhance Bundy's personal power.  At all times relevant hereto, PRN is controlled

through Bundy's operations in Emmett, Idaho. Rodriguez is actively involved in PRN.

Defendants actively market and promote PRN with the objective of increasing the payments that

members of PRN make to the entities Bundy and Rodriguez control, including Dono Custos and

Freedom Tabernacle.

21.      This Court has subject matter jurisdiction pursuant to Idaho Code § 1-705 and

personal jurisdiction over the Defendants pursuant to Idaho Code § 5-514.

22.     Venue is proper in this District pursuant to Idaho Code §§ 5-401 and 5-404.

## GENERAL ALLEGATIONS

**Role of the Idaho Department of Health and Welfare in Child Welfare**

23.     Idaho's laws regarding child safety are primarily administered and implemented by DHW.

24.     Idaho law imposes mandatory reporting requirements on Idaho residents to report concerns about a child's safety.

25.     When a report is filed regarding child safety, DHW assesses the severity of the case.  In high-danger cases, a social worker and possibly police visit the family to check on the child.  Based on the visit and in consultation with the social or healthcare workers, police decide whether to declare the child in imminent danger. If the child is in imminent danger, police may place the child in temporary custody with DHW until a hearing can be held.

**The Role of St. Luke's in Child Health**

26.     SLHS is the only Idaho-based not-for-profit health care system.  SLRMC, a wholly owned subsidiary of SLHS, operates hospitals in Boise ("St. Luke's Boise") and Meridian ("St. Luke's Meridian").  SLHS and SLRMC share the same mission: to improve the health of people in the communities they serve.

27.     The St. Luke's Parties are subject to State and Federal law.  If a child is determined to be in imminent danger because of health issues and is transported to a St. Luke's hospital, the St. Luke's Parties will care for the child.  However, SLHS and SLRMC are not agents of DHW or any other State of Idaho department.  Mr. Roth is an employee of SLHS, and Dr. Erickson and NP Jungman are employees of SLRMC.  They take no direction from DHW or any other State department.

**St. Luke's Care for the Infant**

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 8

28.     On March 1, 2022, the parents took the Infant to the St. Luke's Boise emergency room (ER) because the Infant had reportedly ████████████ and had lost a ████████████

29.     A St. Luke's ER provider treated the Infant for ████████  Then, in consultation with the on-call pediatric specialist, Plaintiff Dr. Natasha Erickson, the ER provider admitted the Infant.  The parents agreed to admission.

30.     Upon admission, St. Luke's began to treat the Infant ████████████ ████████████.  On March 2, 2022, a St. Luke's dietician diagnosed ████████████████████████████ ████████████████████████████ Due to this ████████████████, the dietician and Dr. Erickson agreed on a plan to feed the Infant ████████.

31.     The Infant continued to struggle with oral feeding.  Nevertheless, the parents repeatedly sought to take the Infant home early despite the risk to the Infant.

32.     On March 3, 2022, Dr. Erickson met with the Infant's parents, and explained ████████████████████████████ ████████████████████████ ████████████.  The parents agreed to let the Infant stay at St. Luke's for another day.

33.     On March 4, 2022, the Infant's ████████████.  Although Dr. Erickson recommended ████████████████████ Infant home.  Dr. Erickson agreed to discharge the Infant at the parent's request with ████ ████████████ Dr. Erickson explained

that the Infant ██████████████████████████████████████████████████

████████████████████████████████

34.     The parents were with the Infant throughout the Infant's hospitalization.  They consented to all care at St. Luke's Boise Medical Center.

35.     Neither Dr. Erickson nor any St. Luke's employee-initiated contact with child welfare or any other division of DHW regarding the Infant's hospitalization.

**The Infant's Parents Fail to Attend Follow-Up Appointments**

36.     Following discharge, St. Luke's tried to arrange a visit at the Infant's home on March 5 and March 6, 2022.  However, the Infant's parents did not return their phone calls.

37.     On March 7, 2022, the Infant's parents attended a follow-up appointment with the Infant's new primary care provider (PCP), who is not affiliated with St. Luke's.  The appointment revealed the Infant ████████████████████████████████████████████

████████████████████████.  A follow up appointment was scheduled for March 10, 2022.

38.     The parents attended the March 10, 2022, appointment.  Again, the appointment revealed the Infant ████████████.  The PCP asked the Infant's parents to bring the Infant back for ██████████ on March 11, 2022.

39.     The Infant's parents failed to bring the Infant to the ████████████ on the morning of March 11, 2022.  When the family failed to appear for ████████████, the Infant's PCP referred the situation to DHW.

40.     After hearing from the PCP, DHW determined that the Infant was in immediate danger involving a life threatening and/or emergency situation.  DHW notified the Meridian

Police Department in accordance with DHW's standard practice.  The Meridian PD began trying to locate the Infant.

41.     Later on March 11, 2022, DHW reached out to NP Jungman, a nurse practitioner at St. Luke's CARES (Children at Risk Evaluation Services).  The DHW safety assessor asked NP Jungman for a consult on the Infant's Priority I referral.  NP Jungman reviewed the medical records from the Infant's initial admission, the Priority I referral, and the additional information provided from DHW, and advised DHW and the Meridian PD that the Infant be brought in for evaluation on March 11, 2022.  She told DHW and the Meridian PD that if the family wanted to bring the Infant to St. Luke's CARES voluntarily, she would stay late that afternoon to save the family another visit to the ER.  NP Jungman did not medically diagnose the Infant.

42.     The Meridian PD continued to try and get a response from the parents and tried to locate the Infant.

43.     That afternoon, DHW spoke by phone to the Infant's father, who said that the Infant and the Infant's mother were sleeping, but that they would come to CARES when they woke up.  Despite the representation from the Infant's father, the Infant was not brought to CARES.

**Police Take Custody of the Infant**

44.     Later on March 11, 2022, Meridian police went to the family's residence to check on the Infant's safety.  The family refused to cooperate, provide information, or let the officers see the Infant, forcing the police to get a warrant.

45.     Defendant Rodriguez stated he was present when the police visited the residence and was aware, at least by the time of the visit, that the police were looking for the Infant out of concern for the Infant's health.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 11

46.     Rodriguez took no steps to assist the police in obtaining information regarding the Infant.

47.     When the police left the house to get a warrant, the Infant and the Infant's parents moved to another location.

48.     Believing the Infant was at risk of imminent harm due to the Infant's ███ ██████████, the parents' failure to follow medical advice, and the family's refusal to provide the police with information, the Meridian PD alerted its officers that the Infant was in danger and instructed them to look for the parents' vehicle.

49.     The police located the Infant and the Infant's parents late on the night of March 11, 2022, in Garden City.  When the Infant's parents refused to cooperate, the police took custody of the Infant and transported the Infant to St. Luke's Meridian in an ambulance.

50.     At the time the Infant was taken into custody, the parents were informed that there would be a court hearing within 48 hours and that the ultimate objectives were to assure the safety of the Infant and keep the family unit intact.

51.     The St. Luke's Parties had no authority regarding, did not participate in, and played no role regarding how the Infant was taken into custody.

**The Infant ████████ at St. Luke's Boise**

52.     In the early hours of Saturday, March 12, 2022, providers at St. Luke's Meridian evaluated the Infant and quickly decided to transfer the Infant to the pediatric floor of the St. Luke's Boise Medical Center for ████████████.

53.     When the ten-month-old Infant was admitted to St. Luke's in Boise for a second time, the Infant ████████████████████████████.  The Infant had ██████ ████████████████████████████ eight days earlier.  The Infant's ██████████

████████████████████████████████████████████████████

████ The Infant's ████████████████. The Infant's ████████████████. The
Infant had █████████████████████████████████████████.
The Infant's █████████████████████████ from March 4 to
March 11, 2022.

54.     Once again, St. Luke's ████████████████████████

████████ The Infant's ████████████. The Infant began ████████████.

55.     St. Luke's providers gave the Infant's parents detailed updates on the Infant's

████████████████. But despite the Infant's ████████████████, the parents refused to

provide medical information, including birth records, newborn screening, and prior medical

records. The Infant's parents stated that they were withholding the medical information on

advice from their attorney.

56.     St. Luke's updated the Infant's parents on the Infant's status throughout the

Infant's treatment. The Infant's parents consented to the Infant's treatment plan.

57.     Contrary to Defendants' statements, St. Luke's did not vaccinate the Infant

against the wishes of the parents. The St. Luke's Parties did not "harm [the Infant] in irreparable

ways." Nor did they "abuse" the Infant. As explained below, such statements were false and

were intended to attract media attention, incite followers, collect donations, disrupt hospital

operations, and defame the St. Luke's Parties.

**The Infant is Discharged and Returned to His Family**

58.     Once again, ████████████████████████████████████

████████████. On March 15, 2022, St. Luke's discharged the Infant as the Infant was

████████████████████████████████, and healthy enough for outpatient care.

St. Luke's decision to discharge the Infant was purely based on the Infant's medical condition, not the ongoing protests, pressure, or threats from Defendants or their followers discussed below.

59.     The court proceedings relating to the Infant are confidential.

60.     St. Luke's discharged the Infant to DHW, which in turn released the Infant to his parents on March 18, 2022.

**Defendants Create a False Narrative**

61.     As alleged above, St. Luke's doctors treated the Infant's ██████████ ██████████. The Infant was returned to the parents.  DHW acted to ensure the safety of the Infant and pursued the goal of returning the Infant to the parents.  The confidential court proceedings provided for by statute occurred.

62.      Nevertheless, Bundy, Rodriguez, and the other Defendants chose to exploit the events surrounding DHS's intervention and the Infant's care to enhance their standing and to profit financially.

63.     Defendants' prestige, political influence, personal brands, "business," and revenue all depend on Defendants' ability to market themselves as leaders in the fight against governmental overreach. The size of the membership of PRN, and, in turn, the amount of revenues flowing to the Bundy Campaign, Bundy's Dono Custos and Abish-husbondi entities, and Rodriguez's Freedom Tabernacle all depend on Defendants' efforts to market themselves as champions fighting against government conspiracies. Likewise, the more Rodriguez is able to raise his profile among his target market, the better chance he has to sell his followers services through Power Marketing.

64.     Defendants perceived the events surrounding DHW's intervention as an opportunity to spread their lies and further their agendas.  They realized that the facts

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 14

surrounding DHW's intervention could be mischaracterized as a governmental conspiracy to kidnap, traffic, and kill children.  Then, in turn, Defendants realized they could establish themselves as crusaders against their falsely manufactured governmental conspiracy.

65.    To that end, Defendants worked together to manufacture a false narrative of a state-sponsored child kidnapping and trafficking ring that included DHW, the police, the Idaho Judiciary, the Governor of Idaho, the Infant's PCP, and the St. Luke's Parties.

66.    In support of their wrongful objectives, Defendants defamed the supposed members of the kidnapping and child trafficking ring and then incited their followers by stating that countless children, like the Infant, would be kidnapped, trafficked, and potentially killed unless immediate action was taken to destroy the St. Luke's Parties and others.

67.    Defendants acted in concert to disseminate this false narrative.  Evidence indicates that Bundy, Rodriguez, and the other Defendants coordinated talking points and the timing of demonstrations and provided the same directions to followers regarding how to disrupt the St. Luke's Parties.  They told their followers to target the same individuals for doxing and harassment.  Defendants mirrored false statements across the websites and social media they controlled.

68.    Defendants operated as a single enterprise to defame and harm the St. Luke's Parties and others.

**Defendants Knowingly Harmed the St. Luke's Parties**

69.    Defendants were aware of the likely impact of their joint actions.  When they developed their plan, Bundy, Rodriguez, and the other Defendants knew that spreading their false claims would result in damage to the St. Luke's Parties, including death threats, business interruption, trespass, reputational damage, menacing crowds, and potentially mob violence.

70.     Despite foreseeing the consequences, Bundy, Rodriguez, and the other Defendants acted to maximize harm and damage.  As Rodriguez bragged publicly, Defendants wanted to harass and shame the St. Luke's Parties with claims of child kidnapping and murder such that St. Luke's employees would be shunned by their families and lose their careers, while St. Luke's itself would be run out of business.  Bundy, Rodriguez, PRN and the other Defendants intended or acted recklessly to enflame followers so there would be violence or, at least a real threat of violence against the St. Luke's Parties.

71.     Bundy, Rodriguez, and the other Defendants knew that a legal process existed to address the custody and welfare of the Infant. Bundy and Rodriguez were involved in and kept informed of all legal proceedings relating to the Infant.

72.     Defendants knew their harassment and threats of violence they generated would not deter those targeted from doing what was best for the Infant.  They knew that the judge would not be cowed into changing how she would rule in the case.  They knew that DHW would not act contrary to what it believed was in the best interest of the Infant.  They knew the St. Luke's Parties would not discharge the Infant until the Infant was medically ready for discharge. And they knew the St. Luke's Parties did not have the authority to determine whether the Infant would be discharged home or to a foster family.

73.     Despite knowing that DHW, the trial court, and the St. Luke's Parties would not be threatened into abandoning the law or the Infant's best interests, Defendants engaged in their coordinated false statements and wrongful acts.  Defendants did so because their wrongful acts were motivated by other goals.

74.     The facts and circumstances indicate that Defendants' motives in creating and disseminating the false kidnapping and child trafficking narrative included, but are not limited to

Exhibit D, Page 51

the following goals: (1) generating support for the Bundy Campaign; (2) raising and monetizing the political profiles and personal brands of Bundy and Rodriguez, especially within the People's Rights Network and other political groups; (3) driving web traffic to sites controlled by Defendants; (4) solidifying control over their followers; (5) creating financial gain in the form of payments to and donations to Bundy's campaign, PRN, Rodriguez's PAC, and a fund that was established for Rodriguez's family; (6) generating more revenue for Rodriguez's Power Marketing entities and his Freedom Tabernacle Incorporated; and (7) generating more money for Bundy's entities, including Dono Custos and Abish-husbondi.

**False Narrative Regarding DHW's Intervention**

75.     Understanding the need to create a narrative that served a larger conspiracy theory, Rodriguez misrepresented the circumstances that led to DHW's intervention regarding the Infant.  Among other things, Rodriguez, with assistance from the other Defendants, falsely asserted that the Infant was not at risk and had a "100% clean bill of health" when taken into custody, that the parents had only missed a single medical appointment, and that Dr. Erickson had reported the parents and the Infant to DHW.

76.     In truth, Rodriguez knew or should have known that the Infant was ████████ and faced significant ████████.  Rodriguez knew the parents had failed to follow several steps needed to ensure the Infant was receiving needed medical care and failed to respond to those properly seeking information regarding the health of the Infant.  Rodriguez further understood that he had no factual basis to assert that Dr. Erickson had contacted DHW.  Dr. Erickson never contacted DHW regarding the Infant.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 17

**Exhibit D, Page 52**

**Bundy Trespasses at St. Luke's Meridian to Generate Publicity and Contributions**

77.     Bundy has a history of forcing confrontation with police to generate publicity for himself and his political agenda and in order to make money for himself.

78.     Shortly after the police took the Infant into custody, Bundy was made aware and took action to garner publicity and, in turn, make money for himself.

79.     When Bundy learned that police had transported the Infant to St. Luke's in Meridian, Bundy and a group of his followers travelled to the hospital for the purpose of initiating a conflict with the police and potentially getting arrested.  He knew that by orchestrating a protest and arrest at the hospital that he would win media attention, enhance his brand, and likely generate financial contributions for himself and the Bundy Campaign.

80.     On Saturday, March 12, 2022, at around 1:30 a.m., Bundy and his followers entered the ambulance bay at St. Luke's in Meridian—a primary access point for medical emergencies.  Once there, the group yelled and cursed at hospital staff and uniformed police officers.  As Bundy planned, his followers were prepared with their cameras and immediately shared the confrontation Bundy manufactured on social media.

81.     St. Luke's security guards recognized Bundy, based on his actions and direction of the crowd, as "the catalyst and aggressor in the group."

82.     Hospital staff explained to Bundy and his followers that the group was blocking emergency access to the ambulance bay and asked them to move to a nearby area where they would not block patient access.  Following Bundy's lead, the group refused to move and continued to harass hospital staff.

83.     Hospital staff told Bundy and his followers that they would be trespassing if they stayed in the ambulance bay.  Once again, the group refused to leave.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 18

84.     Recognizing that Bundy's followers were growing more numerous and menacing, a hospital supervisor tried to reason with Bundy and deescalate the situation.  For the benefit of those there to film him, Bundy responded by accusing the supervisor of kidnapping and then demanded that he give Bundy the Infant.  Bundy knew full well he had no legal authority to make that demand because he had no parental rights over the Infant and because the Infant had been taken into protective custody pursuant to Idaho law.

85.     Bundy knew that St. Luke's would not and could not as a matter of law release the Infant into Bundy's custody.

86.     Hospital staff repeatedly warned Bundy and his followers to clear the ambulance bay.  Bundy heard and refused to heed the warnings on at least three occasions.

87.     Bundy knew the police had no option but to arrest him for trespass.  As Bundy intended, the police arrested him just before 2:00 a.m. on March 12, 2022. Bundy was on the way to getting the publicity he craved.

88.     Bundy's followers recorded his arrest for social media and then dispersed.

89.     The police released Bundy a few hours after his trespass.

90.     Upon his release, Bundy immediately began to publicize his arrest.  In accordance with the messaging campaign developed by Rodriguez (a paid marketing consultant for the Bundy Campaign), Bundy mischaracterized the Infant as having been in good health, falsely stated the Infant had been kidnapped from his parents because a single appointment was missed, indicated the Infant's health was at risk in the hospital, falsely stated that he had been arrested for trespass without warning and justification, and directed his followers to the freedomman.org website which already contained messaging supporting the false kidnapping and child trafficking narrative.

91.     Shortly thereafter, the Bundy Campaign and PRN likewise began to publish the same false narrative regarding the Infant's care at St. Luke's and regarding Bundy's arrest at St. Luke's in Meridian.

**Concerted Effort to Disrupt St. Luke's Business**

92.     To further their false narrative, Defendants made false statements regarding the Infants' care and repeatedly defamed the St. Luke's Parties.  In addition, Defendants repeatedly told their followers that the St. Luke's Parties need to be punished and directed their followers on how to shame the St. Luke's Parties and disrupt St. Luke's operations. Defendants intended to incite or acted recklessly to incite followers and the public to threaten violence and to commit violence against the St. Luke's Parties. In particular, Bundy knew he had cultivated a personal following that was conditioned to see him as a leader and quasi-religious figure and that his participation in and endorsement of this false narrative would inspire threats of violence and likely real violence against the St. Luke's Parties by his followers.

93.     Defendants incited their followers by publishing patently untrue statements and providing direction to cause harm, including falsely stating the following:

    a.     St. Luke's Parties were participating in a conspiracy to kidnap, traffic, sexually abuse, and kill children;

    b.     St. Luke's Parties were running a child trafficking ring in order to profit from tax dollars;

    c.     St. Luke's Parties were abusing and harming the Infant in irreparable ways;

    d.     St. Luke's Parties harmed and killed babies all the time;

    e.     St. Luke's Parties kidnapped the Infant and other children;

    f.     St. Luke's Parties were "moronic imbeciles" who neglected the Infant;

    g.     St. Luke's Parties stole the Infant;

h.      St. Luke's changed the Infant into someone who was unrecognizable, lethargic, and unresponsive;

i.      St. Luke's failed to keep the Infant clean;

j.      St. Luke's caused the Infant "suspicious" bruising;

k.      St. Luke's lied about the Infant's treatment;

l.      St. Luke's Parties vaccinated the Infant against the family's wishes;

m.      St. Luke's Parties were "medically negligent";

n.      St. Luke's was "world famous" for "mistreating people," "killing people," and "stealing babies from their parents";

o.      St. Luke's forced the Infant to take "toxic poison" which was then allowed to stay in the Infant's body for days;

p.      St. Luke's Parties changed and falsified information in the medical records to protect themselves;

q.      Mr. Roth was guilty of criminal accessory of child abduction and deprivation of rights under color of law;

r.      Mr. Roth personally profited from the pandemic;

s.      Dr. Erickson was responsible for the Infant's kidnapping;

t.      Dr. Erickson participated in kidnapping "hundreds of children" with the help of a judge;

u.      The Infant "possibly could lose his life because of the decisions of people [at St. Luke's] who don't even care" about the Infant;

v.      The hospital made the Infant "more sickly";

w.      Followers should put "physical pressure" on those "that are causing the problem";

x.      Followers should disrupt St. Luke's operations by protesting, calling in, donating money, making noise, and giving the hospital "hell";

y.      God should "crush the necks of those that are evil."

94.    Defendants caused disruption to St. Luke's operations, harmed staff and patients, and impaired patient care inside the hospital.

95.     Between March 12 and March 17, 2022, Defendants Bundy, Rodriguez, PRN and the other Defendants called on their followers to protest at St. Luke's in Boise, to demand the return of the Infant, and to prevent transfer of the Infant from the hospital into foster care.  In response, crowds, many of whom carried firearms, began to join Bundy and Rodriguez at the hospital in a concerted effort to disrupt the hospital's operations and intimidate hospital staff and patients.

96.     Rodriguez became a daily presence at the hospital.  Rodriguez conducted defamatory "press conferences" outside the St. Luke's Boise hospital.

97.     Incited by Defendants, the crowd of followers harassed patients and staff, and disrupted patient care.  Patients reported feeling anxious and fearful because of Defendants' noisy and menacing protests.

98.     On March 15, 2022, Defendants went so far as to cause St. Luke's to go into lockdown for more than an hour.  During this time, nurses, doctors, and other employees could not enter or exit the building.  St. Luke's directed patients to other facilities and rerouted ambulances to other sites.

99.     Defendants also organized a campaign of technological disruption.  They encouraged their followers to flood St. Luke's phone lines and email inboxes in an effort to shut down St. Luke's operations.  Defendants' followers jammed phone lines with menacing calls (including death threats), sent threatening emails, and sent spam emails to disrupt servers. Using his notoriety, Bundy repeatedly directed his followers to disrupt St. Luke's operations.

**Solicitations for Donations to Rodriguez's Family**

100.    Concurrently while acting to harm the St. Luke's Parties, Rodriguez, with help from the other Defendants, solicited money based on false representations relating to the Infant,

the circumstances leading to DHW's intervention, the parents' financial condition, and the St. Luke's Parties.

101.    A center piece in almost every one of Rodriguez's media appearances was a solicitation for donations to his family members, the parents of the Infant.  Likewise, the solicitation for donations was advertised on peoplesrights.org and freedomman.org.

102.    These solicitations for charitable contributions were made based on the defamatory statements about the St. Luke's Parties and others kidnapping, trafficking, and killing children.

103.    The solicitations were also premised on false statements regarding the parents' liability for the medical care provided by SLHS, SLRMC, and Dr. Erickson.  Rodriguez repeatedly stated that the St. Luke's Parties were performing unnecessary medical tests and treatments on the Infant, unnecessarily extending the Infant's time at the hospital to increase costs, and extorting the Infant's parents.  These statements were false.

104.    As Rodriguez knew or recklessly failed to learn, the parents did not have significant financial liability relating to the ▮▮▮▮ care.  While the Infant's ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the parents were uninsured, governmental assistance and St. Luke's policies alleviated any significant financial burden.

105.    While the Infant was ▮▮▮▮▮▮▮▮, the Infant's parents were made aware that significant costs were being covered by government assistance.  St. Luke's also took steps to assist the parents in minimizing the financial impact of the healthcare provided to the Infant.  For example, when the Infant's parents expressed concerns about paying for the hospital stay during the Infant's first admission, a St. Luke's employee screened the family and informed them that they likely qualified for Medicaid assistance.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 23

106.     A patient care coordinator passed their concerns along to a patient financial advocate (PFA), and the PFA spoke with the Infant's mother on March 2, 2022, to discuss financial assistance options.  The PFA screened the family for Medicaid and advised the Infant's mother that, given their reported family income, the Infant qualified for Children's Health Insurance Plan (CHIP) under Medicaid.  The employee later tried to call the Infant's parents on March 3, 2022, and March 8, 2022, to offer further assistance, but the parents did not answer or return the calls.

107.     Medicaid covered the Infant's medical bills for both ER visits and admissions. Despite absence of insurance, the Infant's family does not have any outstanding balance due to St. Luke's. The Infant's family never paid anything for and owe nothing for the care the Infant received at St. Luke's, including the care received during the hospital stay March 1-4, 2022 which was initiated by the Infant's parents.

108.     Despite knowing that the Infant's parents had not incurred significant liability for the medical care received at SLRMC, Rodriguez, assisted by the other Defendants, continued to solicit donations, and received more than $115,000 based on misrepresentations that the St. Luke's Parties had engaged in wrongdoing and that St. Luke's had created huge financial liability for Rodriguez's family.

**Defendants Used the False Narrative to Market PRN and Other Business Ventures**

109.     Defendants used their false narrative regarding the Infant to market PRN.

110.     Defendants repeatedly misrepresented that the Infant was released to the Infant's parents based on the fact that PRN had acted to disrupt the operations of the St. Luke's Parties and acted to intimidate and threaten the St. Luke's Parties.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 24

111.    Defendants made these false statements knowing that the Infant was released in accordance with the judicial proceedings, because St. Luke's was able to stabilize the Infant's medical condition, and because protections wereput in place to protect the Infant's health going forward.

112.    Defendants knew that PRN and the other Defendants did not assist with or accelerate the release of the Infant to the parents. Defendants knew that their actions had actually slowed and complicated the process of returning the Infant to the parents. Nevertheless, Bundy and Rodriguez and the other Defendants committed to selling the false narrative to grow membership in PRN and to make money off members who were directed to make payments to Rodriguez's Freedom Tabernacle entity and/or Bundy's Dono Custos entity.

113.    In fact, even after the Infant was returned to the Infant's parents, Rodriguez and Bundy have continued to exploit the Infant by incessantly marketing the Infant and his likeness through social media and alternative media to promote PRN, Bundy in campaign advertising, and Rodriguez and his multiplicity of sales schemes.

**Defendants Continue to Defame and Call for Harassment**

114.    Defendants' efforts to disrupt and dismantle St. Luke's and defame Plaintiffs did not stop when the Infant was discharged.

115.    Seeking to continue to benefit politically and financially from the false conspiracy Defendants manufactured, Rodriguez recently created the group "People Against Child Trafficking."

116.    On March 26, 2022, Bundy and Rodriguez organized a rally on property owned by one of Bundy's companies.

Exhibit D, Page 60

117.    The rally was heavily advertised by Defendants and was exploited as a

fundraising event by the Bundy Campaign.

118.    During the March 26, 2022, rally, Defendants continued to make false,

defamatory statements about the St. Luke's parties, including the following:

     a.    Defendant Rodriguez stated Dr. Erickson kept the Infant in the hospital to "rack[] up the bill" while displaying defamatory images of Dr. Erickson on a large movie screen;

     b.    Defendant Rodriguez stated the St. Luke's Parties engaged in kidnapping and child trafficking for money;

     c.    Defendant Rodriguez indicated that the St. Luke's Parties were taking part in the "greatest child trafficking ring in the history of the world"; and

     d.    Defendant Bundy described the St. Luke's Parties as equivalent to rapists, comparing the St. Luke's Parties to "feudal lords" practicing "primae noctis";[1]

119.    At the March 26, 2022, rally on the Bundy Property, Rodriguez bragged about

shutting down St. Luke's phones system such that St. Luke's "couldn't even operate."

120.    At the March 26, 2022, rally, Defendants used defamatory speech to incite people

to join PRN and to take the fight against the St. Luke's Parties and other supposed kidnappers

and child traffickers "all the way to the end."

121.    The defamatory statements made at the March 26, 2022, rally were streamed and

the video was later posted to social media sites and to websites controlled by Defendants.

122.    Defendants continue to defame the St. Luke's Parties, including but not limited to

publishing or making the following false, misleading, and defamatory statements.

---

[1] Primae Noctis names an ancient tradition in which all noble lords had the right to have sex with any female subject, regardless of her will, and even with a virgin bride on her wedding night. https://www.dictionary.com/e/historical-current-events/prima-nocta/#:~:text=Prima%20nocta%20is%20the%20semi,particularly%20on%20her%20wedding%20night.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 26

123.    Defendant Bundy falsely and publicly reaffirmed that all of his prior public statements about Plaintiffs were true.

124.    Defendant Bundy falsely and publicly accused St. Luke's of taking the Infant.

125.    Defendant Bundy falsely and publicly accused St. Luke's of taking other peoples' children.

126.    Defendant Rodriguez falsely and publicly accused St. Luke's of being involved in a child trafficking network and kidnapping children.

127.    Defendant Rodriguez falsely and publicly accused St. Luke's of profiting off of the false kidnapping of the Infant.

128.    Defendant Rodriguez falsely stated in emails in support of a web site he is creating that St. Luke's is corrupt and wicked and is involved in extortion harming Idahoans every day.

129.    Defendant Rodriguez falsely stated on a website of his creation that St. Luke's and its CEO Mr. Roth are corrupt, wicked, and commit extortion every day.

130.    Defendant Rodriguez, Bundy, and PRN have repeatedly made the false statements that Plaintiffs participated in a conspiracy with DHW and Governor Little to kidnap and traffic the Infant in retaliation for Bundy's political opposition to government actions taken to mitigate the COVID-19 pandemic.

131.    In a video that he produced and promoted widely on the internet on or about February 10, 2023, Bundy falsely stated that Dr. Erickson misdiagnosed the Infant and called CPS.

132.    In a video that he produced and promoted widely on the internet on or about February 10, 2023, Bundy falsely stated that Chris Roth was an accessory to child abduction.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 27

133. In a news article published in the Idaho Press on or about February 10, 2023, Bundy falsely stated that Dr. Erickson misdiagnosed the Infant.

134. In an interview on or about January 27, 2023, which was posted and promoted on the internet, Bundy falsely stated that St. Luke's misdiagnosed the Infant multiple times, three times while in the hospital's care.

135. On or about January 17, 2023, Bundy published "Come No More Upon Me, A Warning Letter from Ammon Bundy" ("Come No More Threat") on the PRN website and on other websites which contains a number of false statements, including, but not limited to, false statements that: (1) the Infant was taken into protective custody as part of a conspiracy involving St. Luke's and government officials which targeted Bundy; and (2) that he was forced to sell his home because St. Luke's put a lien on the property.

136. Further, Bundy and PRN updated the "Come No More Threat" numerous times between January 17, 2023 and February 10, 2023 to make additional threats and false statements, including, but not limited to: (1) that "the Senior Executives at St. Luke's are getting away with committing horrible crimes against children in Idaho . . ."; and (2) that St. Luke's negotiated with him regarding his criminal trespass.

137. Defendant Bundy made numerous false public statements that the Infant was neglected while in St. Luke's care. Among other places, Bundy made these false statements on or around February 9, 2023 on the internet video blog entitled "The Pete Santilli Show".

138. Defendant Rodriguez has repeatedly used hate speech directed at the LGBTQ+ community while making false statements in widely disseminated interviews that St. Luke's participates in a conspiracy to kidnap babies from Godly, Christian families in order to traffic the babies to "homos" who are likely to abuse or kill the stolen babies.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 28

139.   Defendant Rodriguez falsely stated St. Luke's is involved in child trafficking, and

in any number of wicked and heinous offenses against society and people of faith, specifically.

## COUNT I
## (DEFAMATION (LIBEL AND SLANDER)—
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

140.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

141.   Defendants have published false, misleading, and defamatory statements about

Plaintiffs directed to third parties including, but not limited to:

a.   Defendant Rodriguez falsely and publicly accused St. Luke's of being "world famous" for "mistreating people," "killing people," and "stealing babies from their parents."

b.   Defendant Rodriguez falsely and publicly accused St. Luke's of forcing the Infant to take "toxic poison."

c.   Defendant Rodriguez falsely and publicly accused Plaintiffs of participating in an "organized crime ring" and "harming" the Infant.

d.   Defendants falsely and publicly accused Plaintiffs of kidnapping children.

e.   Defendants repeatedly told their followers and supporters to disrupt St. Luke's operations by protesting, calling in, donating money, and making noise.  Followers heeded these commands, resulting in serious threats to Plaintiffs.

f.   Defendant PRN published a wanted poster featuring a headshot of Mr. Roth with the caption: "WANTED: Chris Roth, President/CEO of St. Luke's."  Under the headshot, the website falsely accused Mr. Roth of "Criminal accessory of child abduction and deprivation of rights under color of law."  Defendants encouraged protestors to make signs using this image.

g.   Defendant FMP published a list of pictures under the heading: "Main People Responsible for ▮▮▮▮▮▮▮ Kidnapping."  Dr. Erickson's picture was the first on the list.  FMP then falsely stated that Dr. Erickson "was the first to call CPS" and accused her of being "the initial trigger that got everything started."  FMP later added NP Jungman to the list.

h.   Defendant Rodriguez falsely and publicly stated that Dr. Erickson "had a panic attack and literally sent a CPS worker or social worker to [Rodriguez's] daughter's hospital room to interview her."

i.    Defendant Rodriguez falsely and publicly stated that Dr. Erickson is incompetent at her profession, stating the "hospital doesn't understand even the basic common-sense things that anybody understands."

j.    Defendants FMP and Rodriguez published the false statement that experts at St. Luke's "harm and kill babies all the time." This false accusation is intended to defame doctors at St. Luke's including Dr. Erickson.

k.    Defendant Bundy falsely and publicly accused Judge Fortier of taking "hundreds of children . . . with this Doctor Natasha D. Erickson."

l.    Defendants FMP and Rodriguez published the false statements that NP Jungman "personally financially benefitted from this Child trafficking" and that she "takes innocent little children that have just been ripped from their families and starts looking at and asking them about their privates."

m.    Defendants FMP and Rodriguez published a false statement implying that NP Jungman committed "medical malpractice."

n.    Defendant Rodriguez falsely stated that St. Luke's was involved in kidnapping the Infant for a profit.

o.    Defendant Rodriguez stated that St. Luke's is connected to a medical mafia.

p.    Defendant Bundy falsely stated that Dr. Erickson misdiagnosed the Infant.

q.    Defendant Bundy falsely stated that Chris Roth and Dr. Erickson are the ones who took the Infant from his parents.

r.    Defendant Bundy falsely stated that St. Luke's misdiagnosed the Infant multiple times.

s.    Defendant Bundy falsely states that St. Luke's mistreated and neglected the Infant while the Infant was in their care.

t.    Defendant Bundy falsely stated that St. Luke's targeted the Infant for kidnapping because of Bundy's opposition to COVID "corruption".

u.    Defendant Rodriguez falsely stated St. Luke's is involved in child trafficking, and in any number of wicked and heinous offenses against people of faith, specifically.

142.    These statements were false.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 30

143.    At the time Defendants made the statements, they knew the statements were false, or made the statements with reckless disregard for their truth and made such statements with malice.

144.    Defendants' statements were not subject to privilege or justified communications.

145.    Defendants made or published the statements with the purpose of defaming or disparaging Plaintiffs, in an effort to injure Plaintiffs' business and reputation.

146.    Defendants make these false statements in an effort to benefit themselves financially.

147.    Defendants' statements involve false allegations of criminal activity and/or involve matters incompatible with business, trade, profession, or office, and are defamatory *per se*.

148.    In particular, Defendant Bundy made false statements directed at Dr. Erickson which involve matters incompatible with business, trade, profession, or office, and are defamatory *per se*.

149.    Defendants made false statements that Plaintiffs were committing crimes and wrongful acts against Christians or people of faith intending that those false statements would increase the likelihood of their followers or other members of the public would harass and/or commit violence against Plaintiffs.

150.    Defendants Rodriguez and Defendant FMP used hate speech directed at the LGBTQ+ community in their false statements against Plaintiffs intending that those false statements would increase the likelihood that their followers or other members of the public would harass and/or commit violence against Plaintiffs.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 31

151.     As a direct and proximate result of Defendants' publication of such statements,

Plaintiffs have suffered economic and non-economic harm in an amount to be proven at trial.

152.     Because Defendants' statements were made knowingly, intentionally, willfully,

and/or maliciously, Plaintiffs seek punitive damages in an amount to be proven at trial.

## COUNT II
### (INVASION OF PRIVACY—MR. ROTH, DR. ERICKSON, AND NP JUNGMAN AGAINST ALL DEFENDANTS)

153.     Plaintiffs Mr. Roth, Dr. Erickson, and NP Jungman incorporate the foregoing

allegations as if fully set forth herein.

154.     Through their actions described above, Defendants have published materially

false statements concerning Mr. Roth, Dr. Erickson, and NP Jungman to third parties.

155.     These statements were false.

156.     These statements placed Mr. Roth, Dr. Erickson, and NP Jungman in a false light

in the public eye.

157.     At the time Defendants made the statements, they knew the statements were false,

or made the statements with reckless disregard for their truth and made such statements with

malice.

158.     Defendants' statements were not subject to privilege or justified communications.

159.     As a direct and proximate result of Defendants' publication of such statements,

Mr. Roth, Dr. Erickson, and NP Jungman have suffered damages in an amount to be proven at

trial.

160.     Because Defendants' actions were done knowingly, intentionally, willfully,

and/or maliciously, Mr. Roth, Dr. Erickson, and NP Jungman seek punitive damages in an

amount to be proven at trial.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 32

## COUNT III
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS—
### MR. ROTH, DR. ERICKSON, AND NP JUNGMAN AGAINST ALL DEFENDANTS)

161.    Plaintiffs Mr. Roth, Dr. Erickson, and NP Jungman incorporate the foregoing allegations as if fully set forth herein.

162.    Through their actions described above, Defendants engaged in extreme and outrageous conduct that went beyond all possible bounds of decency in a civilized society.

163.    Defendants' conduct was intentional or reckless.

164.    As an actual or proximate result of Defendants' wrongful conduct, Mr. Roth, Dr. Erickson, and NP Jungman suffered the requisite injuries.

165.    As a direct and proximate result of Defendants' wrongful conduct, Mr. Roth, Dr. Erickson, and NP Jungman have suffered damages in an amount to be proven at trial.

166.    Because Defendants' actions were done knowingly, intentionally, willfully, and/or maliciously, Mr. Roth, Dr. Erickson, and NP Jungman seek punitive damages in an amount to be proven at trial.

## COUNT IV
### (TRESPASS-SLHS AND SLMRC AGAINST BUNDY AND RODRIGUEZ)
### (COMMON LAW)

167.    Plaintiffs SLHS and SLRMC incorporate the foregoing allegations as if set forth fully herein.

168.    Defendant Bundy entered the ambulance bay at St. Luke's Meridian property on Saturday, March 12, 2022.

169.    Defendant Bundy did not have permission to be in the ambulance bay at St. Luke's Meridian property.

170.    Defendant Bundy remained in the ambulance bay at St. Luke's Meridian property after being instructed to leave and blocked access to the ambulance bay.

171.    The ambulance bay at St. Luke's Meridian property is restricted to authorized medical and emergency personnel.

172.    Defendant Bundy's presence in the ambulance bay at St. Luke's Meridian property interfered with St. Luke's ability to provide medical care to patients and conduct its business.

173.    Defendants Bundy and Rodriguez entered St. Luke's Boise property on Tuesday, March 15, 2022, while leading a large crowd for the express purposes of disrupting hospital operations and generating publicity for a political cause that benefited Defendants and generating revenue for Defendants.

174.    Defendants Bundy and Rodriguez did not have permission to enter or remain on St. Luke's Boise property because they were not seeking medical care or treatment and were not authorized visitors.

175.    Defendants Bundy and Rodriguez interfered with hospital staff, blocked public access to the hospital, and disrupted hospital operations.

176.    Defendants Bundy's and Rodriguez's presence at St. Luke's Boise property interfered with St. Luke's ability to provide medical care to patients and conduct its business.

177.    As a direct and proximate result of Defendants Bundy's and Rodriguez's actions, Plaintiff St. Luke's has suffered damages in an amount to be proven at trial.

**COUNT V**
**(TRESPASS-SLHS AND SLRMC AGAINST BUNDY AND RODRIGUEZ)**
**(STATUTORY TRESPASS PURSUANT TO I.C. § 6-202)**

178.    Plaintiffs SLHS and SLRMC incorporate the foregoing allegations as if set forth fully herein.

179.    Defendant Bundy entered the ambulance bay at St. Luke's Meridian property on Saturday, March 12, 2022.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 34

180.    Defendant Bundy did not have permission to be in the ambulance bay at St. Luke's Meridian property.

181.    Defendant Bundy acted intentionally and willfully when he entered and remained in the ambulance bay at St. Luke's Meridian property.

182.    Defendant Bundy remained in the ambulance bay at St. Luke's Meridian property after being instructed to leave and blocked access to the ambulance bay.

183.    The ambulance bay at St. Luke's Meridian property is not open to the public and is not accessible by the public.  Entry into the ambulance bay is restricted to authorized medical personnel, emergency responders, and patients seeking emergency care.

184.    Defendant Bundy's presence in the ambulance bay at St. Luke's Meridian property interfered with St. Luke's ability to provide medical care to patients and conduct its business. Bundy took this action for an improper purpose.

185.    Defendants Bundy and Rodriguez entered St. Luke's Boise property on Tuesday, March 15, 2022, as protestors. Bundy and Rodriguez took these actions for improper purposes.

186.    Defendants Bundy and Rodriguez acted intentionally and willfully when they entered and remained present at St. Luke's Boise property.

187.    St. Luke's Boise property is open to the public who are actively seeking medical care or treatment.  St. Luke's lawfully restricts access to its Boise property to patients and authorized visitors only.

188.    Defendants Bundy and Rodriguez did not have permission to enter or remain on St. Luke's Boise property because they were not seeking medical care or treatment and were not authorized visitors.

Exhibit D, Page 70

189.     Defendants Bundy and Rodriguez interfered with hospital staff and patients, blocked public access to the hospital, and disrupted hospital operations.

190.     Defendants Bundy's and Rodriguez's presence at St. Luke's Boise property interfered with St. Luke's ability to provide medical care to patients and conduct its business.

191.     As a direct and proximate result of Defendants Bundy's and Rodriguez's actions, Plaintiff St. Luke's has suffered damages in an amount to be proven at trial and should be awarded attorneys' fees relating to this claim and pursuant to I.C. § 6-202(3)(a)(ii) (civil trespass). In the event of default, SLHS and SLRMC each should be awarded damages for this cause of action in an amount of no less than $250,000 from each Defendant, Bundy and Rodriguez, and in addition, in the amount of $50,000 in attorneys' fees relating to this claim from Bundy and Rodriguez.

## COUNT VI
### (UNFAIR BUSINESS PRACTICES—ALL PLAINTIFFS AGAINST DEFENDANTS BUNDY, RODRIGUEZ, AND FMP)

192.     Plaintiffs incorporate by reference each of the foregoing allegations as if set forth fully herein.

193.     Defendants engage in political activism, the marketing of the personal brands of Bundy and Rodriguez, and related business activities for financial gain.

194.     Ammon Bundy is in the business of generating revenue for himself, his political campaign, the PRN, and other businesses he owns, such as Abish-husbondi, Inc. and Dono Custos, Inc, by marketing his personal brand as a political activist and leader to garner donations, revenues, and fees.

195.     Rodriguez generates revenue for himself and his businesses through his personal brand, his political activism, the FM PAC, FMP, sale of his self-published books, speaking engagements, provision of marketing services to the Bundy for Governor Campaign, and through

his consulting services sold through the Power Marketing entities. For example, Rodriguez exploits the likeness of the Infant and the notoriety created by the false narrative regarding the Infant to advertise Power Marketing.

196.    FMP owns and operates freedomman.org.  FMP generates revenue and/or other benefits for Rodriguez through traffic to the site and by serving as a marketing vehicle for Rodriguez's business ventures, including, but not limited to, Freedom Tabernacle Incorporated and the Power Marketing entities.

197.    SLHS and SLRMC are not-for-profit companies which provide medical services in Idaho.

198.    Mr. Roth is the CEO and President of SLHS.

199.    Dr. Erickson is a physician employed by SLRMC.

200.    NP Jungman is a nurse practitioner employed by SLRMC.

201.    In the conduct of trade or commerce and in seeking revenue for themselves, Bundy, Rodriguez, and FMP engaged in methods, acts, and practices unlawful under Idaho Code title 48, chapter 6, including, but not limited to, falsely disparaging the business and professional reputation of the St. Luke's Parties.

202.    Bundy, Rodriguez, and FMP knew, or in the exercise of due care should have known, that they engaged in unconscionable methods, acts, or practices in the conduct of trade or commerce, as provided in Idaho Code § 48-603C.

203.    The actions and practices of Bundy, Rodriguez, and FMP are misleading, false, or deceptive.

204.    Bundy's, Rodriguez's, and FMP's conduct and pattern of conduct are outrageous and offensive to the public conscience.

**Exhibit D, Page 72**

205.    As a direct result of these wrongful acts and practices, the St. Luke's Parties have been damaged more than $250,000.00, in an amount to be proven at trial.

**COUNT VII**
**(IDAHO CHARITABLE SOLICITATION ACT—ALL PLAINTIFFS AGAINST DEFENDANTS RODRIGUEZ AND FMP)**

206.    Plaintiffs incorporate by reference each of the foregoing allegations as if set forth fully herein.

207.    Defendants Rodriguez and FMP engaged in the solicitation of charitable contributions to the "Save ███████ from Medical Kidnapping" campaign.

https://givesendgo.com█████████

208.    Defendants Rodriguez and FMP solicited charitable contributions based on false statements regarding supposed medical bills owed to SLHS and SLRMC. In truth, the parents of the Infant never made any payments to SLHS or SLRMC for medical services and owe no money to SLHS or SLRMC for medical services as the medical services were covered by government programs.

209.    Defendant Rodriguez and FMP planned, conducted, and executed solicitations for charitable contributions by utilizing unfair, false, deceptive, misleading, or unconscionable acts and practices.

210.    In soliciting for charitable contributions, Rodriguez and FMP engaged in methods, acts, and practices unlawful under Idaho Code title 48, chapter 12, including, but not limited to, falsely disparaging the business and professional reputation of the St. Luke's Parties, manufacturing a false conspiracy of kidnapping, trafficking, and killing of children involving the St. Luke's Parties, and falsely representing the amount of liability incurred relating to medical expenses associated with treatment of the Infant.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 38

211.    SLHS and SLRMC are not-for-profit companies which provide medical services in Idaho that were disparaged as part of the charitable solicitation.

212.    Mr. Roth is the CEO and President of SLHS who was disparaged and part of the charitable solicitation.

213.    Dr. Erickson is a physician employed by SLRMC who was disparaged as part of the charitable solicitation.

214.     NP Jungman is a nurse practitioner employed by SLRMC who was disparaged as part of the charitable solicitation.

215.    Rodriguez and FMP knew, or in the exercise of due care should have known, that they engaged in unconscionable methods, acts, or practices in the conduct of trade or commerce, as provided in Idaho Code § 48-603C, standards incorporated into the Idaho Charitable Solicitations Act.

216.    The actions and practices of Rodriguez and FMP relating to the solicitation of the charitable contributions were and continue to be misleading, false, or deceptive.

217.    Rodriguez's and FMP's conduct and pattern of conduct are outrageous and offensive to the public conscience.

218.    As a direct result of these wrongful acts, Rodriguez and FMP caused more than $115,000 to be donated wrongfully.

219.    As a direct result of these wrongful acts and practices, the St. Luke's Parties have been damaged owing to the false and defamatory statements to generate donations.

220.    As a direct result of these wrongful acts and practices, the public has been misled.

221.    Rodriguez and FMP should be assessed damages and attorneys' fees (pursuant to I.C. §§ 48-608, 48-1205), in an amount proven at trial pursuant to the purpose of the Idaho

Charitable Solicitations Act. In the event of default, Rodriguez and FMP should be forced to disgorge at least $115,000 and pay attorneys' fees in the amount of $50,000 to Plaintiffs for fees incurred relating to this claim.

## COUNT VIII
### (CIVIL CONSPIRACY TO COMMIT DEFAMATION, INVASION OF PRIVACY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, TRESPASS, UNFAIR BUSINESS PRACTICES, AND WRONGFUL CHARITABLE SOLICITATIONS—ALL PLAINTIFFS AGAINST DEFENDANTS)

222.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

223.    Defendants each willfully, intentionally, and knowingly agreed and conspired with each other to publish false, misleading, and defamatory statements about Plaintiffs directed to third parties, as described above.

224.    Defendants Rodriguez and Bundy further agreed and conspired to unlawfully trespass on Plaintiff St. Luke's property.

225.    In furtherance of this conspiracy, Defendants defamed all Plaintiffs, invaded the privacy of Mr. Roth, Dr. Erickson, and NP Jungman, intentionally inflicted emotional distress on Mr. Roth, Dr. Erickson, and NP Jungman, unlawfully trespassed onto Plaintiff St. Luke's property, committed unfair trade practices against all Plaintiffs, and defamed all Plaintiffs in furtherance of a conspiracy to violate the Idaho Charitable Solicitation Act.

226.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

227.    By virtue of the formation and operation of this conspiracy, Defendants, as participants in the conspiracy, are liable as joint tortfeasors for each other's misconduct.

## REQUEST FOR JURY TRIAL

Pursuant to Idaho Rule of Civil Procedure 38, Plaintiffs hereby request trial by jury as to all issues that are properly so tried.

FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 40

**PRAYER FOR RELIEF**

Counterclaimants respectfully request the following relief from this Court:

A.      An award to each of the St. Luke's Parties from each of the Defendants for damages in the sum to be proven at trial but in no event less than $250,000;

B.      Injunctive relief requiring the Defendants: (1) to cease posting and disseminating defamatory statements against the St. Luke's Parties; (2) to cease making statements that the St. Luke's Parties are criminals and/or participate in the kidnapping, trafficking, sexual or any other abuse, and/or killing of children; (3) to remove from all online locations Defendants have authority to do so any and all statements that the St. Luke's Parties are criminals and/or participating in the kidnapping, trafficking, sexual or any other abuse, and/or killing of children; (4) to cease disseminating and encouraging others to disseminate the contact information, personal information, and images of Mr. Roth, Dr. Erickson, and NP Jungman; and (5) to remove from all online locations Defendants have authority to do so the contact information, personal information, and/or images of Mr. Roth, Dr. Erickson, and NP Jungman.

C.      An award to the St. Luke's Parties of their reasonable attorneys' fees and costs for this matter under Idaho Code §§ 12-120(3), 12-121, 6-202(3)(a)(ii) (civil trespass), 48-608 (unfair business practices), and 48-1205 (Charitable Solicitation Act), or other applicable authorities and statutes;

D.      An award of punitive damages in the sum to be proven at trial; and

E.      Provide such other relief as the Court determines fair, just, and appropriate under the circumstances.

DATED this 3rd day of March, 2023.

HOLLAND & HART LLP

By: */s/Erik F. Stidham*
   Erik F. Stidham
   Jennifer M. Jensen
   *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2023, I caused to be filed and served, via iCourt, a true and correct copy of the foregoing by the method indicated below, and addressed to the following:

| | | |
|---|---|---|
| Ammon Bundy for Governor | ☐ | U.S. Mail |
| P.O. Box 370 | ☒ | Hand Delivered Via Process Server |
| Emmett, ID 83617 | ☐ | Overnight Mail |
| | ☐ | Email/iCourt/eServe: |
| | | |
| Ammon Bundy for Governor | ☐ | U.S. Mail |
| c/o Ammon Bundy | ☒ | Hand Delivered Via Process Server |
| 4615 Harvest Ln. | ☐ | Overnight Mail |
| Emmett, ID 83617-3601 | ☐ | Email/iCourt/eServe: |
| | | |
| Ammon Bundy | ☐ | U.S. Mail |
| 4615 Harvest Ln. | ☒ | Hand Delivered Via Process Server |
| Emmett, ID 83617-3601 | ☐ | Overnight Mail |
| | ☐ | Email/iCourt/eServe: |
| | | |
| People's Rights Network | ☐ | U.S. Mail |
| c/o Ammon Bundy | ☒ | Hand Delivered Via Process Server |
| 4615 Harvest Ln. | ☐ | Overnight Mail |
| Emmett, ID 83617-3601 | ☐ | Email/iCourt/eServe: |
| | | |
| People's Rights Network | ☐ | U.S. Mail |
| c/o Ammon Bundy | ☒ | Hand Delivered Via Process Server |
| P.O. Box 370 | ☐ | Overnight Mail |
| Emmett, ID 83617 | ☐ | Email/iCourt/eServe: |
| | | |
| Freedom Man Press LLC | ☒ | U.S. Mail |
| c/o Diego Rodriguez | ☐ | Hand Delivered |
| 1317 Edgewater Dr. #5077 | ☐ | Overnight Mail |
| Orlando, FL 32804 | ☐ | Email/iCourt/eServe: |
| | | |
| Freedom Man Press LLC | ☒ | U.S. Mail |
| c/o Diego Rodriguez | ☐ | Hand Delivered |
| 9169 W. State St., Ste. 3177 | ☐ | Overnight Mail |
| Boise, ID 83714 | ☐ | Email/iCourt/eServe: |
| | | |
| Freedom Man PAC | ☒ | U.S. Mail |
| c/o Diego Rodriguez | ☐ | Hand Delivered |
| 1317 Edgewater Dr., #5077 | ☐ | Overnight Mail |
| Orlando, FL 32804 | ☐ | Email/iCourt/eServe: |

Diego Rodriguez                        ☐   U.S. Mail
1317 Edgewater Dr., #5077              ☐   Hand Delivered
Orlando, FL 32804                      ☐   Overnight Mail
                                       ☑   Email/iCourt/eServe:
                                           freedommanpress@protonmail.com


                                       _/s/Erik F. Stidham_____
                                       Erik F. Stidham
                                       OF HOLLAND & HART LLP


21008987_v1


FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL - 44

**Exhibit D, Page 79**

# EXHIBIT C

## LEGAL DESCRIPTION

A tract of land being a portion of the Northwest 1/4 of the Southwest 1/4 of Section 25, Township 6 North, Range 2 West, Boise-Meridian, Gem County, Idaho, described as follows:

COMMENCING at the Northwest corner of the Northwest 1/4 of the Southwest 1/4 of Section 25, Township 6 North, Range 2 West, B.M., marked by an aluminum capped monument; thence South 89°24'50" East, 964.56 feet along the North line of said Northwest 1/4 of the Southwest 1/4 to a set 1/2" iron pin with plastic cap PLS 6552 and the REAL POINT OF BEGINNING;
thence continuing South 89°24'50" East, 286.78 feet to a set 1/2" iron pin with plastic cap PLS 6552;
thence South 00°12'12" West, 813.90 feet to a point on the centerline of Black Canyon Canal, said point being on the arc of a non-tangent 120.00 foot radius curve to the right, a radial bearing to said point bears South 07°53'57" East;
thence along said centerline the following courses and distances:
Northeasterly along the arc of said curve through a central angle of 40°02'24" a distance of 83.86 feet; tangent to said curve North 57°51'33" West, 105.60 feet to the beginning of a tangent 200.00 foot radius curve to the left; Northwesterly along the arc of said curve through a central angle of 16°18'00" a distance of 56.90 feet; tangent to said curve North 74°09'33" West, 67.37 feet;
thence leaving said centerline North 00°12'12" East, 701.95 feet to the REAL POINT OF BEGINNING.

TOGETHER WITH a 40.00 foot wide ingress and egress easement in the West Half of Section 25, Township 6 North Range 2 West, Boise-Meridian, lying South and East of the following described line:

Beginning at the Southwest corner of the Southwest 1/4 of the Northwest 1/4 of said Section 25; thence South 89°24'50" East 1307.64 feet, along the South line of said Southwest 1/4 of the Northwest 1/4 to the Southeast corner thereof, marked by a 5/8 iron pin;
thence North 01°27'04" East, 782.24 feet along the East line of said Southwest 1/4 of the Northwest 1/4 to the terminus of this easement.

**Exhibit D, Page 81**